(C. D. 149)

BACHARACH INDUSTRIAL INSTRUMENT CO. *v.* UNITED STATES

## United States Customs Court, First Division

(Decided April 17, 1939)

*Jerome G. Clifford* (*George W. Israel* of counsel) for the plaintiff.
*Webster J. Oliver*, Assistant Attorney General (*Samuel D. Spector*, special attorney, and *Frank X. O'Donnell, Jr.*, junior attorney), for the defendant.

Before McClelland, Sullivan, and Brown, Judges

Sullivan, Judge: The appraiser's reports in these three protests having been filed within the legal time, are part of the record. They are identical, and read as follows:

Merchandise under protest consists of so-called "Ardometers" which employ the pyrometric method in operation and was advisorily classified at 60%—228–A following T. D. 48085.

The tariff act involved is that of 1930.

In protest 936964–G the red-ink notation on the invoice shows that the classification of this merchandise was as "parts for optical measuring instruments." In protest 951222–G the red-ink notation on the invoice shows the merchandise to have been classified as "Optical measuring instruments." The invoice is not with the papers in the third protest, but it is safe to conclude that these so-called "Ardometers" were classified either as optical measuring instruments, or as parts thereof.

In each protest the claim of the plaintiff corporation is that—

Said merchandise [ardometers and parts thereof] is dutiable at 35% ad valorem under Par. 353, or at 45% ad valorem under Par. 397. [Words in brackets ours.]

Paragraph 353 is as follows:

All articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy;

electrical telegraph (including printing and typewriting), telephone, signaling, radio, welding, ignition, wiring, therapeutic, and X-ray apparatus, instruments (other than laboratory), and devices; and

articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs;

all the foregoing, and parts thereof, finished or unfinished, wholly or in chief value of metal, and not specially provided for, 35 per centum ad valorem.

The claim under paragraph 397 relates to manufactures of various kinds of base metal "not plated with platinum, gold or silver, or colored with gold lacquer" and not specially provided for.

At the opening of the trial at Pittsburgh the minutes disclose the following oral motion and ruling:

Mr. Israel. At this time the plaintiff moves to amend the protest so as to include the following additional claims: That the merchandise is properly dutiable at 40% under par. 360, or at 45% under par. 397.

Mr. Spector. (Defendant's counsel) No Objection.

Judge Dallinger. The amendment is allowed.

This motion does not appear to have been made in writing as provided in rule 9 (2) of the rules of this court.

Paragraph 360 provides for a duty of 40 per centum ad valorem on scientific and laboratory instruments, etc., "wholly or in chief value of metal, and not plated with gold, silver, or platinum, finished or unfinished," and parts thereof.

Counsel for both sides stipulated orally in open court "that the merchandise is in chief value of metal, namely aluminum, and not plated with platinum, gold or silver, or with gold lacquer."

Mr. J. A. Stein was the only witness. He testified on behalf of the plaintiff that he is a mechanical engineer, and an officer of the plaintiff corporation; that his duties are as "the chief engineer of the Bacharach Instrument Company"; that he is familiar with the merchandise in question.

One of the ardometers in question was received in evidence as Exhibit 1, and a diagram thereof as Illustrative Exhibit A. The witness described the functions of Exhibit 1 as follows:

The functions of Exhibit 1 are to measure the temperature of a hot body, or a heated body; and it does this by intercepting the radiant energy emitted by this heated body, and converging such heated radiant energy on the hot junction, so-called, of a thermocouple system. * * * A thermocouple is descriptive of two dissimilar metals, which are joined, and whose effect is to generate a voltage when heated. The heated rays then are converged on the hot junction of the thermocouple; and the hot junction is the junction which is heated, there being another junction that is unheated. The voltage generated by reason of the heat imparted to this hot junction by the radiant energy converging upon it is conducted outside of the instrument. * * * It is conducted by means of wires to a measuring instrument known as a galvanometer.

The witness testified Exhibit 1 as imported is without any connecting wires or galvanometer, and is without any device for measuring heat; that the heat is measured by a galvanometer, and "You don't measure the heat directly, you measure it indirectly by measuring the voltage," and the voltage is measured by a galvanometer; that without a galvanometer this instrument could not be used; that the galvanometer is a domestic product which is attached to Exhibit 1.

As to the lenses in Exhibit 1 the witness testified:

There is an objective lens in front of the instrument. Now, an objective lens in an optical or radiation instrument is the first lens that the radiant energy meets. The rays are changed——It is the first lens that changes the course of the rays. That is the objective lens. * * * There is a second lens in the rear of the instrument, whose function is to make it possible for an observer to see through the instrument and observe the surface, or body on which the instrument is aimed, if it be of interest to do that. In other words, *the instrument will function just as well without the ocular lens*, or the eye-piece lens, as with it. * * * Now, there is a red glass, which will be observed on this illus-

tration, and which is also embodied in this instrument, the purpose of which is to shield the eye of the observer from the glare, if the incandescence of the body is annoying.

The witness testified the lenses do not aid the eye in making measurements; that the ocular lens—

performs a function in much the same manner as a sort of level on a piece of equipment that must be leveled up before use. This must be properly aimed before use, and it is of assistance in aiming.

The witness further testified:

There is a diaphragm shown on this illustration, whose function is to permit the calibration of the instrument, to permit its range to be adjusted. It is moved back and forth, and intercepts a greater or lesser number of radiant rays.

Counsel then enumerated all the instruments named in paragraph 228 (a), including "optical measuring or optical testing instruments," and asked the witness whether he was familiar therewith the witness testified he was; that Exhibit 1 is not any of them, and in particular is not an optical measuring or optical testing instrument, nor a "testing or recording instrument for ophthalmological purposes."

The witness then gave a demonstration of this instrument, and testified it is used as follows:

It is chiefly used in mills, for the purpose of measuring furnace temperatures, and steel and metal temperatures. * * * It is used on furnaces, on heating furnaces, to measure the temperature of such furnaces, and of the products being heated in said furnaces; and it is used outside of such furnaces to measure the heat of such products as are processed in the mill later. They are used elsewhere.

On cross-examination the witness testified that the uses he referred to for this instrument are not "the exact uses of a pyrometer," but it is similar "in some respects"; that the lenses do not aid the human eye "in telling the temperature of objects"; that the lens "with the handle on" is to view a small heated object, or for the purpose of "aiming" at it; that "you sometimes have to look through the instrument in order to observe that you are on the object. You make no adjustment," although "you sometimes have to slide this in or out," or, in other words—

You adjust the lens at times in order to clearly determine that the instrument is sighted definitely on the object whose temperature is to be measured.

The witness further testified that among other things the object of this machine is to determine the temperature of molten masses, and that "under some conditions" it aids the human eye in so doing.

On redirect examination his counsel showed the witness a pamphlet entitled "Bulletin 299," which he testified "is an advertising bulletin which describes the ardometer," its functions, and how it operates; that it was prepared at or about the time of importation of this instrument in 1937. It was received in evidence as Illustrative Exhibit B.

The witness testified that the human eye does not make any measurement in looking through the eyepiece; that "the heat is measured by measuring the voltage generated in the ardometer by reason of a secondary device known as a galvanometer"; that the eyepiece is used only in a very few instances.

On recross-examination the witness testified:

The eye doesn't measure the temperature, but it is measured by a galvanometer, which is entirely different.

\*  \*  \*  \*  \*  \*  \*

R. X Q. It is necessary to obtain the correct angle on the object in order to get the proper temperature of the object—focused directly on it?—A. Not necessarily directly at it.

R. X Q. I am talking about a small object.—A. It is necessary to be very careful if you are sighting at the object. \* \* \* In the case that you mentioned the lens aids the human eye in adjusting the instrument properly.

R. X Q. Isn't this machine called, or a member of the pyrometer family, or machine?—A. Indeed.

He further testified—

This is a radiation pyrometer, and it does not use optical principles in the ordinary sense of the term.

R. Q. The eye doesn't make any measurement of the heat?—A. No.
R. Q. And the lens doesn't aid the human eye in making measurements?—A. No.
R. Q. The only function is to help sight the object?—A. On small objects.
R. Q. Something like a spirit level?—A. Yes.

\*  \*  \*  \*  \*  \*  \*

R. X Q. Can you give us an unqualified answer as to whether or not this machine aids the human eye in obtaining the temperature of objects? \* \* \* A. If you force me to answer that way, I will say no, it does not aid the human eye.

\*  \*  \*  \*  \*  \*  \*

R. X Q. Without forcing you to answer, does it aid the human eye?—A. I can't answer it unqualifiedly.

\*  \*  \*  \*  \*  \*  \*

Judge DALLINGER. As I understand it, it is to locate the object.
The WITNESS. That is it exactly.
Judge DALLINGER. It does not help to measure the heat?
The WITNESS. No, sir; not in the slightest.

In response to questions by the court the witness testified that this instrument is not used in simple research, nor is it chiefly used in laboratories.

The protests were submitted without further evidence.

We find the following on the 1st, 2nd, and 3rd pages of Bulletin 299 (Illustrative Exhibit B):

Mounted at a safe and cool location, the Ardometer automatically indicates or records the surface temperature of the hot body on which it is sighted. After the Ardometer is once correctly sighted, it needs practically no attention throughout years of continuous operation. \* \* \*

\*  \*  \*  \*  \*  \*  \*

Ardometers are used on glass tanks, cement kilns, ceramic kilns, soaking pits, enamel smelters, enameling furnaces, controlled atmosphere furnaces, forge

furnaces, etc. They are also used to *measure* the temperature of moving bodies as, for instance, sheets passing through continuous normalizers or steel while being rolled.

\*    \*    \*    \*    \*    \*    \*

The Ardometer utilizes the fact that the radiant heat emitted by a hot body is definitely related to its temperature. Referring to the schematic drawing on the opposite page, the heat rays emitted by the hot body are focused by the lens (1) on the thermocouple (2). The emf developed by the thermocouple is *measured by a millivoltmeter or a potentiometer* which may be placed wherever desired. Readings are directly in temperature. Ardometer and *reading instrument* are connected by a pair of ordinary copper wires. \* \* \*

\*    \*    \*    \*    \*    \*    \*

An important feature of the Ardometer which adds greatly to its reliability, is that for *focusing the heat rays a lens is used*, and not a metallic mirror \* \* \*.

\*    \*    \*    \*    \*    \*    \*

If the various factors involved in temperature *measurement* are considered, it will be apparent that temperature *measurements* with the Ardometer can be considered as accurate and, in many cases, even more accurate than those made with a thermocouple. The Ardometer, as compared with the thermocouple, has this important advantage. It can be *sighted* directly on the body under test and then *measures* the temperature of the body itself. \* \* \*

\*    \*    \*    \*    \*    \*    \*

\* \* \* Because of this ability of the Ardometer to *measure* directly and practically instantly the temperature of the material itself, temperature *measurements* with the Ardometer are, in many cases, more accurate than those made with a thermocouple \* \* \*.

\*    \*    \*    \*    \*    \*    \*

The Ardometer requires normally an area of about one inch in diameter *to be sighted on*. However, special Ardometers have been successfully used on strips and wires of less than ½-inch thickness. [Italics ours.]

It will be seen from the foregoing that the "Ardometer" as imported is *part* of a heat measuring mechanism. To complete the apparatus a *measuring* instrument made in the United States, termed a galvanometer, must be attached thereto by wires. Therefore, as stated by the witness, as imported the ardometer is without any device for measuring heat. It is true the ardometer has lenses, one lens, termed the objective lens, being to change the course of the heated rays, or "heated radiant energy," and the other lens in the rear of the ardometer being "to make it possible for the observer to see through the instrument and observe the surface, or body on which the instrument is aimed," or, in other words, it is a sighting or aiming lens. The witness terms the latter lens an "ocular lens," and testified "the instrument will function just as well without the ocular lens or the eye-piece lens as with it"; also, in case it is necessary to take the temperature of a small body "the lens aids the human eye in adjusting the instrument properly" but does not "help to measure the heat." It is indicated in illustrative Exhibit B that after the ardometer is once correctly sighted, it needs practically no attention throughout years of con-

tinuous operation. Apparently, therefore, this "ocular lens or eye-piece lens" is seldom used, and once the ardometer is sighted on the object whose heat it is desired to measure, the ardometer will operate without this lens. There is also "a red glass" to protect the eye from the glare of the incandescent body on which the instrument is sighted.

In *R. Y. Ferner* v. *United States*, T..D. 47101, 65 Treas. Dec. 961, we had before us for classification certain spectrographic comparators, "or instruments used in connection with one or more microscopes for the purpose of obtaining very exact measurements." We held them classifiable as optical measuring instruments under paragraph 228 (a) of the present tariff act. The testimony indicated that while, if the microscopes were omitted, the instruments would "make measurements with not quite such high accuracy," yet that they were *primarily* intended to be used with microscopes. . The inference from our decision is that an optical measuring instrument is an instrument for obtaining very exact measurements *primarily* in connection with optical instruments.

Our judgment in the *Ferner* case, *supra*, was affirmed by the appellate court in 23 C. C. P. A. 62, T. D. 47735. The court said (pp. 65 and 67):

It is clearly disclosed by the record that the close and accurate measurements for which the devices are intended cannot efficiently and properly function except by the use of the microscope, since the devices are used in making microscopic measurements upon a scale containing microscopic measuring lines.

\*  \*  \*  \*  \*  \*  \*

Regardless of the scope intended by the term "optical measuring  \*  \*  \* instruments" and without indicating a precise definition of that term, and without suggesting everything which Congress might have contemplated would be provided for thereby, we feel certain that one of the instruments it intended to include therein was an instrument by which measurements were made, such as those involved in the consideration of the instant appeal, wherein *optical devices and optical principles are involved and essential* in making such measurements. [Italics ours.]

In *Biddle* v. *United States*, T. D. 46022, 62 Treas. Dec. 603, certain so-called microphotometers were involved. They were used "to analyze spectrum lines after they have been recorded on photographic plates" or to "measure the density of the deposit on a photographic plate." Heat *and not light* was used in the performance of those functions. We held that inasmuch as they did not have any of the functions of optical instruments, they were not dutiable at 60 per centum under paragraph 228 (a) as photometers or optical measuring or testing instruments. In that case the evidence indicated that one of the witnesses would not consider such microphotometers optical instruments, optical measuring or optical testing instruments, nor photometers, for the reason they do not measure or compare lights, as does a photometer.

We followed that holding in the *Thomas* case, Abstract 24259, 63 Treas. Dec. 1558, and on appeal therefrom our holding was affirmed in *United States* v. *Arthur H. Thomas Co.*, 22 C. C. P. A. 120, T. D. 47105. The microphotometer in question recorded on a photographic film all the lines and the finest details which had previously been recorded on a spectrogram, *and made visible details* there recorded which would not otherwise show. In the syllabus is a description of its operation as follows:

The record shows that the result obtained is accomplished by heat rays from an incandescent light passing through a negative containing a spectrogram, thence through certain lenses which concentrate onto a vacuum thermocouple (designated as the essential feature of the instrument). The current in the thermocouple is varied as the heat rays strike the lines of the spectrum on the negative. A galvanometer connected with thermocouple and a drum camera complete the operation.

The court held that instrument not to be a photometer, nor an optical measuring or optical testing instrument.

There is a slight similarity between that instrument and the one at bar in that both are operated by heat rays, rather than light, and a thermocouple and galvanometer are used in connection with each instrument; also lenses are used in both, and both are used for measuring, the microphotometer being used to measure "the density of lines on the spectrum," while the instrument at bar measures the intensity of heat.

The instrument at bar, so far as its functions are concerned, would appear to be very similar to a pyrometer used to determine the temperature of objects, which is the function of the instrument at bar. We passed on pyrometers in *Pyrometer Instrument Co.* v. *United States*, T. D. 47683, 67 Treas. Dec. 760. We held them not dutiable as optical measuring or optical testing instruments under paragraph 228 (a), but as metal articles not specially provided for under paragraph 397. We had previously passed on pyrometers in 63 Treas. Dec. 172, and in following our holding in that case that they were not dutiable as optical measuring or testing instruments under paragraph 228 (a) we quoted therefrom as follows:

These pyrometers do not pertain to "the science of optics" but are used to measure the intensity of heat. They have nothing to do with "the science which treats of light and vision."

\* \* \* The eye is used in this pyrometer not for the purpose of assisting, *measuring*, or *testing* vision but to so adjust the instrument in examining a molten mass of metal or glass that the scale of the instrument registers the degree of heat in such molten mass. That is not an optical measuring or testing purpose.

It was brought out by the testimony of a Government witness in that case that the pyrometer was useless without its optical components.

The appellate court reversed us (23 C. C. P. A. 242, T. D. 48085) and held the pyrometers dutiable as optical measuring or testing instruments under paragraph 228 (a). The holding, apparently, was for the reason "that they can be operated for the purpose of obtaining temperature measurements *only* through the use of an optical system which, when being used, aids the human eye" (italics ours), and that "without any one of its optical components the instrument is useless." That is not true of the instrument at bar. In the pyrometer case the lenses were used directly in aiding the eye to ascertain the measurements. In the instant case their only function is to aid the eye in locating the object to be measured, and once the machine is correctly aimed at the object it is unnecessary to aim it again. Further, it was established that the ardometer at bar will function without the ocular lens, as will be seen by the following extract from the testimony of the only witness called (minutes, p. 7):

In other words, the instrument will function just as well without the ocular lens, or the eyepiece lens, as with it.

In the use of the ardometer the eye is not used in measuring, but merely to aim the instrument at the object to be measured, and for this purpose when the object to be measured, to ascertain its heat, is very small, the lenses are an assistance.

Further, it will be observed that in the *Pyrometer* case, *supra*, the testimony of an expert witness was introduced by the Government to support the collector's classification. That is not true in the case at bar. In this case the testimony of plaintiff's witness, a well-qualified expert, stands unrebutted. Besides testifying that the optical parts of this ardometer are not essential to its operation, he has testified that he is familiar with all the instruments detailed in paragraph 228 (a), including optical measuring or optical testing instruments, that this ardometer is not any one of such instruments, and in particular that it is not an optical measuring or optical testing instrument. It would seem to the court, therefore, that plaintiff has made out a *prima facie* case, and that, being unrebutted, the plaintiff's evidence is entitled to greater weight than the mere unsupported presumption of correctness attaching to the action of the collector.

We therefore hold that this ardometer is not dutiable as classified by the collector under paragraph 228 (a).

How then should it be classified?

As to the oral amendment to the protest made at the trial that the merchandise is properly dutiable at 40 per centum ad valorem under paragraph 360, it is unnecessary for us to determine whether or not this ardometer is dutiable under that paragraph for the reason that plaintiff's counsel states in his brief "Plaintiff does not press its claim under paragraph 360." In addition, the testimony indicates

that this ardometer is not used in pure science, but in applied sciences, and for that reason the merchandise would not be classifiable under paragraph 360. (*Conover* v. *United States*, 17 C. C. P. A. 324, T. D. 43743.)

As to the claim under paragraph 353, we find nothing in the record to indicate that this ardometer is an article "suitable for producing, rectifying, modifying, controlling, or distributing electrical energy," or that it is an article "having as an *essential* feature an electrical element or device." On page 12 of the record, however, the witness was asked whether this article is suitable for producing electricity, to which he replied in the affirmative. In our opinion this is not sufficient to bring the ardometer involved within paragraph 353, being wholly unsupported by any facts, and a mere conclusion of the witness. Facts should have been introduced to support this conclusion, and testimony should have been offered to prove in what way and by what means this instrument produced electricity.

As to the claim that this ardometer is dutiable under paragraph 397, it is noted that at the close of its brief the Government calls attention to the concession heretofore referred to that it is in chief value of metal, and states:

\* \* \* in view of the fact that the claim for classification under paragraph 397 at 45 percent ad valorem is urged by plaintiff in its brief herein, the United States does not dispute the merit of such claim.

In view of the fact that the evidence establishes that the merchandise in question is not an optical measuring instrument within paragraph 228 (a), we hold it dutiable, as claimed, under paragraph 397 as—

Articles or wares not specially provided for, if composed wholly or in chief value of \* \* \* aluminum, \* \* \* but not plated with platinum, gold, or silver, or colored with gold lacquer \* \* \*

at 45 per centum ad valorem.

The protests are sustained to this extent. They are overruled in all other respects. Judgment for plaintiff accordingly.