(C. D. 1499)

WILLOUGHBYS CAMERA STORES, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided February 18, 1953)

*Sharretts, Paley & Carter* (*Edward P. Sharretts, Jr.*, of counsel) for the plaintiff. *Charles J. Wagner*, Acting Assistant Attorney General (*Mollie Strum*, special attorney), for the defendant.

Before OLIVER and MOLLISON, Judges

OLIVER, Chief Judge: Counsel for plaintiff, in their brief, have given a clear and concise description of the merchandise before us in this case. The description is as follows:

The imported merchandise, the subject of the protest before the Court, is known as pocket range finders designed to be used in conjunction with photographic cameras. * * * The article is composed in chief value of a brass case as stipulated (R. 11) by Government counsel. Within the brass case there are certain brass fittings and two mirrors, one stationary and the other capable of being moved by a dial or disc knob on the top of the case. There are two glass windows on the side of the range finder in order that an object may be reflected on the mirrors within. On the reverse side there is one glass window so that the operator may view the stationary mirror inside. The movable mirror imposes a picture (or reflection) on the stationary mirror resulting in two identical pictures though not exactly aligned. The operator by moving the knob exactly superimposes the one picture on the other and at that point the measurement indicator on top of the range finder will show the distance in feet that the operator stands from the object selected. Thus the range finder is basically constructed to give a rapid mechanical solution of a triangle having the object at its apex and the range finder at one corner of its base.

The range finders in question were classified under the provision for "all optical instruments" in paragraph 228 (b) of the Tariff Act of 1930, that carries a duty assessment at the rate of 45 per centum ad valorem. Plaintiff claims that the merchandise is properly classifiable as articles wholly or in chief value of brass, not specially provided for, under paragraph 397 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, and dutiable at the rate of 22½ per centum ad valorem.

Plaintiff introduced the testimony of one witness, an employee whose experience as a buyer and seller over a period of 15 years has made him familiar with the pocket range finders under consideration. His testimony supports the description of the present merchandise, as hereinabove set forth, and also shows that the articles in question perform their function with the use of mirrors and that they do not contain lenses or prisms of any kind.

Plaintiff, arguing to overcome the collector's classification of these range finders as optical instruments, cites the cases of *United States* v. *Bliss & Co. et al.*, 6 Ct. Cust. Appls. 433, T. D. 35980, and *R. J. Saunders & Co., Inc.* v. *United States*, 28 Cust. Ct. 39, C. D. 1386.

The *Bliss* case arose under the Tariff Act of 1913 and involved a so-called azimuth mirror, an octant, and a sextant, which are instruments used by navigators in determining the exact location of their vessels at sea. In use, they measure angular distances between a celestial body such as the sun, moon, star, or planet, and the horizon. The importance of the *Bliss* case to the present issue is its discussion of the word "optical." In this connection, the court said:

The word "optics" is well enough in substance defined as the science which treats of light and vision, the organs of sight, chromatics, and all that is connected with the phenomena of sight. See Standard and Century dictionaries. "Optical" of course is an adjective which is derived from the same root as "optics" and means relating to the science of optics.

Continuing on the same subject, the court further stated:

The fact that light is the foundation of vision is doubtless the reason why the science of optics is said to relate not only to the organs of vision but to light itself and doubtless accounts for what we think is the fact, that in the common understanding of the term "optical" relates to the phenomena of both light and vision. They are inseparable, because light itself is "the sensation of which one becomes conscious through the optic nerve."

In the *R. J. Saunders & Co., Inc.*, case, the merchandise was invoiced as "parts for electron image'producer," and was assessed by the collector as a microscope. Although the article was bought and sold in the trade under the designation "electron microscope," we found as a matter of fact that "It might well be described as an 'image producer' rather than as an 'electron microscope.' " It appeared from the record therein that the apparatus is used in the general fields of chemistry or metallurgy or biology and produces enlarged shadow images of minute particles or areas. The desired result is obtained by placing the specimen to be examined in the path of an electron beam emitted from an electron gun which provides the source of the electrons by means of a hot filament that is heated to incandescence by electrical energy. The specimen under examination is held in the path of the electron beam by means of a suitable holder and in proper relation to a magnetic electrical coil employed for shaping or controlling the electron beam. The entire apparatus operates under a vacuum and can be used either to view the shadow picture or, by use of a film or plate holder containing a sensitized film or plate, a permanent record could be made for later study. By that operation of the apparatus, we found that "The result obtained is more in the nature of a measurement or light and shadow record for translation or interpretation by a skilled technician. The operator looks at the screen to view the image, not into the instrument." In holding that the merchandise was not an optical instrument, we referred to the following comment contained in the Summary of Tariff Information, 1939 (p. 552):

**Description and uses.**—Optical instruments are *primarily used to aid or supplement human vision*; they also include apparatus which depends for its operation on the passage of light through prismatic or lenticular optical glass. Lenses and prisms are the fundamental parts of optical instruments. [Italics supplied.]

The articles under consideration are materially different from the kinds of merchandise involved in the *Bliss* and the *R. J. Saunders & Co., Inc.*, cases, *supra*. In this case, plaintiff concedes that these "pocket range finders [are] designed to be used in conjunction with photographic cameras." In other words, the articles in question are dedicated for use as an adjunct to or an accessory with a photographic camera. Thus, the primary purpose of these range finders is to aid in properly focusing a photographic camera. By the use of this

range finder, the operator is enabled to ascertain the distance between the point where the operator is standing and the object to be photographed. Accordingly, we find as matter of fact that the pocket range finder under consideration, being admittedly designed for use with a photographic camera, is primarily an aid to the operator, enabling him to set the lens of the camera more accurately than he could if he relied merely on his judgment of the distance between a given object and the camera. In other words, the range finder in question is a positive aid or a supplement to human vision, and, as such, is an optical instrument.

Plaintiff stresses the fact that the range finder in question performs its function with the use of mirrors, and argues to the effect that because the instrument under consideration does not employ either lenses or prisms, it is, therefore, removed from classification as an optical instrument. This conclusion is not justified. Lenses and prisms are parts of many optical instruments, but their use in any particular apparatus is not all-determinative on the question of whether or not an article is an optical instrument.

The case of *United States* v. *International Forwarding Co.*, 9 Ct. Cust. Appls. 156, T. D. 37995, held, in effect, that the determination of whether or not an article is an optical instrument is dependent on whether it is designed directly or indirectly as an aid to vision, or to produce for optical inspection the picture of some object. In that case, the merchandise under consideration was a polariscope which the court found to be an instrument that enabled the observer to view the phenomena of polarized light and particularly to examine objects under polarized light. In holding the article to be classifiable as an optical instrument, the court considered the uses and functions of the polariscope, within the common meaning of the word, without any reference to the component parts. Funk & Wagnalls New Standard Dictionary defines an optical instrument as "any instrument designed to act upon light, especially one involving reflection, refraction, or polarization." The Standard Dictionary (volume II, p. 1235) contains the same definition. All the foregoing references adhere to the principle that the purpose and function of an article, rather than its constituents, are controlling in determining whether or not it is an optical instrument.

That mirrors have qualities that serve in the science of optics and, hence, are employed in optical instruments, is well recognized in leading lexicographic authorities. The Encyclopaedia Britannica (14 ed., vol. 16, p. 815) under the general subject, "OPTICS," contains the following pertinent statement: *"Geometrical Optics* * * * is the name applied to that part of Optics which deals with the properties of optical instruments such as telescopes, microscopes, photographic lenses, spectroscopes and the elementary lenses, *mirrors* and prisms

from which they are constructed." [Last italics added.] The same encyclopaedia (vol. 15, p. 590) states that a "mirror" is "an optical instrument which produces images of objects by reflection." Funk and Wagnalls New Standard Dictionary defines the noun, "mirror," as "An object having a nearly perfect reflecting surface, used ordinarily to view what can not well be seen directly, as the person of the observer, and in science to concentrate or turn aside a beam of light: usually of glass backed with an amalgam of tin or silver with mercury, or a polished surface of metal." That Congress, too, has recognized the optical properties of mirrors finds confirmation in paragraph 228 (b) of the Tariff Act of 1930, which includes a provision for "mirrors for *optical,* dental, or surgical purposes." [Italics added.]

In the range finder under consideration, the movable mirror imposes a reflection on the stationary mirror, and when the images are superimposed on each other, the reading of the measurement indicator forms the basis for fixing the lens at proper focus. The reflection of light, controlling the adjustment of the movable mirror in the range finder under consideration to supply the basic information for focusing the lens of a camera, is characteristic of the function of an optical instrument within the authorities hereinabove set forth.

The case of *United States* v. *E. Leitz, Inc.,* 26 C. C. P. A. (Customs) 418, C. A. D. 49, cited by defendant, involved a photographic range finder, designed to be detachably mounted on a camera but capable of being used separately. Its function, like the article now before us, was to ascertain the distance between the operator and the object in order that the camera might be put in critical focus. In that case, however, the issue was different from that presented herein. There, the importer sought classification of the range finder as part of a camera. The claim was overruled and the collector's classification as an optical instrument was upheld. It is considered unnecessary to review the case in detail because the decision is largely, if not entirely, a discussion precluding classification of the merchandise as part of a camera.

Both parties in the present case direct attention to the provision for "Range finders designed to be used with photographic cameras," enacted as a modification to paragraph 228 (b) in the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, T. D. 52373, supplementing the General Agreement on Tariffs and Trade, T. D. 51802.

Counsel for plaintiff, in their brief, argue that the specific mention of "range finders" in the modification of paragraph 228 (b) compels the construction that Congress did not intend to include such articles in paragraph 228, as originally enacted, under the principle, "where a subsequently enacted statute includes certain language which did not appear in an earlier act, it is a legislative admission that the lan-

guage of the earlier statute was not broad enough to include the matter thus added," citing *United States* v. *Wells, Fargo & Co.,* 1 Ct. Cust. Appls. 158. T. D. 31211, and *Nat E. Berzen, Inc.* v. *United States,* 23 Cust. Ct. 24, C. D. 1183. This rule was invoked in both of the cited cases upon a showing that there had been an amendment, by statute, of a paragraph of the tariff act, definitely indicating a congressional intent to change judicial interpretation given in the earlier statute.

The principle, however, has no application in the present situation. As aptly stated in defendant's brief, "We are not dealing here with amendment by statute." The modification of paragraph 228 (b), *supra,* was made pursuant to the provisions of section 350 (a) of the Tariff Act of 1930, as amended (19 U. S. C., 1946 ed., sec. 1351 (a)). The limited powers conferred under this amended section 350 (a) are comprehensively set forth in *Abercrombie & Fitch Co.* v. *United States,* 9 Cust. Ct. 336, C. D. 709, wherein the court held to the effect that the authority of the President to proclaim modifications of "existing duties" must necessarily have reference to existing rates of duty on existing classifications of imported merchandise under the respective paragraphs of the Tariff Act of 1930. The same interpretation may be found in the case of *United States* v. *Canadian National Railways,* 29 C. C. P. A. (Customs) 272, C. A. D. 202. In that case, lithographically printed tourist literature was claimed to be classifiable under an *eo nomine* provision for such merchandise in paragraph 1410, as amended by the trade agreement with Canada, T. D. 49752. The claim was overruled after finding that the scope of paragraph 1410, as originally enacted, did not include lithographically printed articles. In reaching its conclusion, the court said:

In the modification of said paragraph 1410, by the said trade agreement, "tourist literature" was first mentioned *eo nomine.* That fact, however, is of no importance here for the reason that that portion of the said agreement modifying paragraph 1410 was clearly intended to change the rate of duty only on articles already embraced within the scope of said paragraph.

Following the decisions in the *Abercrombie & Fitch Co.* and *Canadian National Railways* cases, it can be said that the specific provision for "Range finders designed to be used with photographic cameras" in paragraph 228 (b) as modified, *supra,* manifests an intention to change the rate of duty on that particular type of optical instruments already embraced within the scope of paragraph 228 (b), as originally enacted.

For all of the reasons hereinabove set forth, the protest is overruled, and judgment will be rendered accordingly.