**ENGIS EQUIPMENT COMPANY**

**v.**

**UNITED STATES.**

**C. D. 3670; Protest No. 61/11048-12156.**

United States Customs Court,
First Division.
Jan. 20, 1969.

Wallace & Schwartz and Schwartz & Lidstrom, Chicago, Ill. (Barnes, Richardson & Colburn, New York City, Earl R. Lidstrom, Chicago, Ill., Joseph Schwartz and Rufus E. Jarman, Jr., New York City, of counsel), for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Morris Braverman, Glenn E. Harris,

and Dominick M. Minerva, New York City, trial attys.), for defendant.

Before WATSON and MALETZ, Judges.

MALETZ, Judge:

The importations in this case consist of autocollimators which were invoiced as "Optical assemblies modified without electrical equipment * * *, suitable for assembly with electrical parts into a complete precision auto collimator * *." They were classified by the collector as optical measuring instruments under paragraph 228(a) of the Tariff Act of 1930, as modified, and assessed with duty at the rate of 50 percent ad valorem.

Plaintiff's claim is that the collector's classification is erroneous and that the autocollimators are properly classifiable under paragraph 360 of the act, as modified, as scientific or laboratory instruments dutiable at 25½ percent ad valorem. Alternatively it is claimed that the imports are properly classifiable under paragraph 353 of the act, as modified, as articles having as an essential feature an electrical element or device dutiable at 13¾ percent ad valorem.

Quoted below are the tariff provisions involved:

*Classified under:*

Paragraph 228(a) of the Tariff Act of 1930, as modified by T.D. 52739 and supplemented by T.D. 52820:

> * * * optical measuring or optical testing instruments, * * * frames and mountings therefor, and parts of any of the foregoing; all the foregoing, finished or unfinished ..................... 50% ad val.

*Claimed under:*

Paragraph 360 of the Tariff Act of 1930, as modified by T.D. 54108:

> Scientific and laboratory instruments, apparatus, utensils, appliances (including mathematical instruments but not including surveying instruments), and parts thereof, wholly or in chief value of metal, and not plated with gold, silver, or platinum, finished or unfinished, not specially provided for:
>
>      *    *    *    *    *    *    *    *
>
>      Other (except * * *) ................. 25½% ad val.

Paragraph 353 of the Tariff Act of 1930, as modified by T.D. 52739 and supplemented by T. D. 52820:

> Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal and not specially provided for:
>
>      *    *    *    *    *    *    *    *
>
>      Other (except * * *) ................. 13¾% ad val.

———◆———

We now consider the facts in the case as established in the record,[1] observing at the outset that an autocollimator is an instrument which is used to deter-

[1] The record consists of (i) the testimony of two witnesses—a sales engineer employed by plaintiff and a sales engineer employed by a Chicago-based producer of optical measuring instruments; (ii) a number of mechanical drawings depicting

mine the flatness or straightness of a surface by obtaining angular measurements that are then converted into linear values. In lateral profile, the instrument is a horizontally oriented tube-like structure that is mounted on a metal base or cradle. Its principal functional components consist of an eyepiece, a micrometer unit, a collimator tube or telescope, certain glass elements, an electrical system, and (presumably) a mirror.

As to the functions of the various components, the first segment, starting at the left end of the tube, is a micro-scopic unit which includes a glass-element eyepiece that operates in conjunction with an adjacent micrometer unit.[2] The micrometer unit houses a filar plate, i. e., a glass surface on which is drawn a network of lines known as the reticle that is brought into focus by the eyepiece. The lines and spaces between the lines represent linear units of measurement that correspond to the angular values the autocollimator is intended to define.

The next segment is a cylindrical collimator (or telescope) section whose function is the emission of a beam of parallel rays of light. To accomplish this objective, the collimator is focused at infinity. At the top and left-most portion of the cylindrical collimator is an electrical element that contains a light bulb. (The electrical components are domestically produced and are inserted after importation of the autocollimator.)

The instrument is built on a flat base with leveling screws so that it can be laid on a flat surface, level to a given plane and a mirror moved in front of it. An image of the graduated reticle, illuminated by the light source, leaves the collimator as parallel rays of light. These parallel rays are then reflected back into the collimator by means of the mirror, and the reticle image is thereby returned to and focused on the glass filar plate that is contained in the micrometer box. If the returning image of the reticle and the actual reticle are congruent or super-posable, this signifies that the surface is perfectly flat. On the other hand, failure of the reflected reticle image to coincide with the reticle drawn on the filar plate signifies that the surface is not perfectly flat. Measurement then consists of a comparison between this deviation and the normal position. This is accomplished by an operator viewing these real and reflected images through the eyepiece of the microscopic unit and then taking a reading.[3]

■ In this factual setting, we hold, for the reasons set out below, that the autocollimators in issue are optical measuring instruments within the meaning of paragraph 228(a) and that the collector's classification is therefore correct.

■ We start by detailing what characteristics are necessary to qualify a device as an optical measuring instrument for tariff purposes. First, the device must function in such manner that employment of its optical features is dominant or primary, as compared to the role of its other components. E. g., United States v. American Machine & Metals, Inc., 29 CCPA 137, 144, C.A.D. 183 (1941); Chas. Kurz Co. v. United States, 57 Cust.Ct. 90, 96–97, C.D. 2735 (1966). Second, the device's optical elements must be essential to its operation; that is, to be considered an optical measuring instrument, the device cannot be operated in its intended manner without the opti-

---

various views of the imported merchandise; (iii) a list of the importer's autocollimator shipments during the years 1960–62; and (iv) the deposition of an officer of the manufacturer-exporter concerning the autocollimator's component material of chief value.

2. The eyepiece may be replaced by a photoelectric cell. While such a substitution would increase the precision of the autocollimator, it would still be necessary for an individual to take the readings that result from use of the instrument.

3. The autocollimators in issue are capable of measurements that are precise to the extent of five-millionths of an inch.

cal components. See e. g., Clara M. Ferner v. United States, 23 CCPA 62, 67, T.D. 47735 (1935); Bacharach Industrial Instrument Co. v. United States, 2 Cust.Ct. 306, 312, C.D. 149 (1939). Third, optical measuring instruments must, in performing their intended function of measurement, act upon, deal with, or route rays of light. This interaction between light and such optical elements as lenses, prisms and mirrors normally manifests itself in divergence, convergence, reflection, refraction, polarization, or merely conveyance of light rays. E. g., The Bendix Corporation v. United States, 57 Cust.Ct. 184, 197, C.D. 2759 (1966); Chas. Kurz Co. v. United States, supra, 57 Cust.Ct. at 97; R. J. Saunders & Co., Inc. v. United States, 28 Cust.Ct. 39, 42–43, C.D. 1386 (1952); Chicago Apparatus Co. v. United States, 62 Treas. Dec. 567, 570–571, T.D. 46009 (1932). Finally, the optical system of the instrument must aid human vision or create for inspection a picture or image of some object. See e. g., Paillard, Inc. v. United States, 57 Cust.Ct. 439, 447–448, C.D. 2833 (1966); The Bendix Corporation v. United States, supra, 57 Cust.Ct. at 197; Decca Radar, Inc. v. United States, 57 Cust.Ct. 165, 171, C.D. 2755 (1966).

These requirements are set out as follows (though in somewhat abbreviated manner) in the Summary of Tariff Information, 1929, page 552:

* * * Optical instruments are primarily used to aid or supplement human vision; they also include apparatus which depends for its operation on the passage of light through prismatic or lenticular optical glass. Lenses and prisms are the fundamental parts of optical instruments.

Against this background, plaintiff— while conceding that the autocollimator is a measuring instrument—insists that it is not an optical instrument. Its main arguments are that (1) lenses and prisms are not fundamental parts of the instrument; (2) the instrument is not prin-

cipally used to aid or supplement human vision; (3) the inclusion of a microscopic unit does not *ipso facto* render the instrument an optical instrument; and (4) the instrument's measurement of angular as opposed to "dimensional" values precludes its classification as an optical instrument.

We do not agree. Rather, re-examining the autocollimator in the framework of the applicable criteria set forth above, we think it clear that the device is an optical measuring instrument. To begin with, the dominant functional components of the autocollimator are its optical elements, i. e., lenses and (presumably) a mirror. This is apparent from the manner in which the instrument manipulates light. For it first emits a beam of parallel rays, and then passes the rays out of the telescopic tube through what appears to be a convex lens. See exhibit 2. The mirror then reflects the light back into the tube via the transparent convex optical element, and the light or image is then focused on a glass plate, and finally conveyed to a human observer. Thus, except for the incidental light-emitting electrical element that is affixed after importation, all of the autocollimator's functional components are optical in nature; i. e., they affect light in a manner that can only be explained by ascribing to them the characteristics of optical elements. Accordingly, the autocollimator is readily distinguished from those devices that have been denied classification as optical measuring instruments or optical instruments on the ground that they were not primarily or dominantly optical. For example, in United States v. American Machine & Metals, Inc., supra, 29 CCPA 137, it was held that a device which created an indentation in metal and then optically measured the resulting hollow was not an optical measuring instrument because the dominant or primary use of the article did not lie in the employment of its optical features.[4] Simi-

---

4. It is quite correct, as plaintiff argues, that the inclusion of a microscopic unit

does not *ipso facto* render an instrument an optical instrument. It is equally cor-

larly, in Hensel, Bruckmann & Lorbacher, Inc. v. United States, 20 Cust.Ct. 327, Abstract 52364 (1948), this court held that an article that measured radiant energy by electrical means and only incidentally employed an optical system was not an optical measuring instrument.[5]

Next, it is obvious that the optical elements contained in the collimator and microscope of the autocollimator are essential to the performance of its intended function—the precision measurement of angular values. Plaintiff has suggested no alternative to the collimator for producing and manipulating the parallel rays of light that give rise to the crucial reflected reticle image. Instead, plaintiff emphasizes the possibility of substituting a photoelectric cell for the eyepiece (see note 2, supra), and argues that the autocollimator's optical elements are therefore not essential parts. But the fact that such substitution is possible scarcely means that the eyepiece is nonessential. Just as a lens (for example) would be essential to a camera even though it might be replaced by an entirely dissimilar lens, so the eyepiece is still an essential part of the autocollimator notwithstanding the possibility of substitution by another item performing a similar function. Quite distinguishable is American Askania Corporation v. United States, supra, 21 Cust.Ct. at 29, where the court indicated that the optical eyepiece of an article there in issue— a magnetic field balance used in geographical formations—was not an essential or integral component and held that the device was not an optical measuring instrument since the necessary readings could be taken even if the eyepiece and scale were removed. The important consideration in Askania is that the device did not, in order to function, require substitution or replacement of the removed optical component. Here, on the other hand, there is no evidence whatever that the autocollimator can function without an eyepiece or a substitute therefor, such as a photoelectric cell. Moreover, in the present case, substitution of a photoelectric cell for the eyepiece, either before or after importation, would create an autocollimator differing from the one here in issue, whereas removal of the eyepiece in the Askania case, before or after importation, would merely compel use of the same article without one of its components. It is fundamental that the condition in which merchandise is imported controls its classification. Dwight v. Merritt, 140 U.S. 213, 219, 11 S.Ct. 768, 35 L.Ed. 450 (1891); Worthington v. Robbins, 139 U.S. 337, 341, 11 S.Ct. 581, 35 L.Ed. 181 (1891). And (as indicated) merely because the autocollimator in issue can be modified by utilizing a photoelectric cell does not establish that the eyepiece or microscopic unit is not essential to the autocollimator in its imported condition. But even if it were to be assumed that the eyepiece is not essential, this would still not advantage plaintiff inasmuch as the collimator itself is indisputably an essential optical feature of the autocollimator.

We also conclude that the autocollimator, in performing its intended function, meets the further criterion of acting upon, dealing with, or routing rays of light in the manner required of an optical measuring instrument. It is unnecessary to repeat our discussion of the autocollimator's manipulation of light rays; it is sufficient to state, in sum-

---

rect, of course, that the presence of a microscopic unit does not *preclude* such classification. In short, the presence of a microscopic unit is itself not crucial. What is crucial is whether the employment of the microscopic and other optical units is primary or dominant as compared to the role of the other components.

5. Also relevant are the following cases which applied the criterion of "primarily

or dominantly optical" and then held that the optical features of the merchandise involved were subordinate to other more prominent components: Henry Wild Surveying Instrument Supply Co. of America, et al. v. United States, 32 Cust. Ct. 91, C.D. 1586 (1954); American Askania Corporation v. United States, 21 Cust.Ct. 26, C.D. 1121 (1948). See also Chas. Kurz Co. v. United States, supra, 57 Cust.Ct. at 96.

mary, that the measurement finally arrived at is almost exclusively the product of the interaction between autocollimator components and light.

We now turn to the requirement that "optical measuring instruments" aid human vision or create for inspection a picture or image of an object. In this connection, the parties have debated the applicability to this case of the decision in United States v. Bliss & Co. et al., 6 Ct.Cust.Appls. 433, T.D. 35980 (1915). *Bliss* involved the interpretation of a 1913 Tariff Act provision for "optical instruments." The instruments in issue consisted of three articles—azimuth mirrors, sextants and octants. The azimuth mirror was mounted on a compass for the purpose of checking its readings by comparing the known bearing of some object on land, or the sun or the North Star with the compass bearing, the difference between the known bearing and the compass bearing being the angular error of the compass. The octant and the sextant were navigational instruments to measure the angular distance between a celestial body and the horizon. The sole purpose of the azimuth mirror, octant and sextant was to enable the location of ships and other objects to be ascertained and determined by angular measurements. The court held that the instruments were not optical instruments, stating that the result was " * * * not optical but mathematical, viz, the measurement of an angle," and that " * * * [the imports] do not aid vision * * *." 6 Ct.Cust.Appls. at 440. See also United States v. Arthur H. Thomas Co., 22 CCPA 120, T.D. 47105 (1934).

Leaving aside the fact that the 1913 act under which *Bliss* arose—unlike the 1930 act—contained no provision for optical measuring instruments, it is clear that the instrument here involved aids vision. To ascertain whether or not vision is aided by a particular device, we look to the intended purpose or function of the complete article. Willoughbys Camera Stores, Inc. v. United States, 30 Cust.Ct. 76, 79, C.D. 1499 (1953). In this context, the autocollimator's intended purpose is to determine flatness or straightness (or deviations therefrom) that may be too subtle for the human eye to detect. Like the autocollimator, the human eye is frequently used to examine a surface or an object in order to determine its relative flatness or straightness. The human eye (and mind) similarly translate other optical visions into angular terms, even though the results may be approximations. For example, flat surfaces are frequently referred to in terms of their creating an angle of 180 degrees; a wall is frequently referred to as forming a 90-degree angle with a floor; a clock's hand may be described as circumscribing a path of 360 degrees or forming an angle of 90 degrees with another hand. The point is that a device, such as an autocollimator, that assists the normal visual process in making angular determinations is unquestionably an aid to vision. Indeed, we think it would be a *reductio ad absurdum* to deny a device classification as an optical measuring instrument solely on the ground that its use results in a mathematical conclusion. For ordinarily mathematics is essential to precision measurement, and such measurement is *the very purpose for which optical measuring instruments are to be used*. What the appeals court said in Clara M. Ferner v. United States, supra, 23 CCPA at 67, is applicable here:

> * * * [W]e feel certain that one of the instruments * * * [Congress] intended to include * * * [as an optical measuring instrument] was an instrument by which measurements were made, such as those involved * * * [here], wherein optical devices and optical principles are involved and essential in making such measurements.

See also Chas. Kurz Co. v. United States, supra, 57 Cust.Ct. at 95.

Helpful on the question of "aid to vision" is United States v. Pyrometer Instrument Co., 23 CCPA 242, T.D. 48085 (1935), in which it was held that a pyrometer was an optical measuring in-

strument. The pyrometer was designed to measure the temperature of various objects by determining optically the variance between the quantity of heat being measured and a standardized or given quantity of heat emitted by the target. Its mode of operation was described as follows (23 CCPA at 244):

> * * * This optical pyrometer intercepts light which emanates from a molten mass, by the optical system called the objective system, which is located in the front of the instrument. That objective system intercepting the light emanating from the molten mass, forms an image within the plane of that instrument. On that plane is located an illuminated target. The energy for illuminating that target is received from a self-contained battery and light source. There is also located on the plane where this optical image is being formed, an optical filter, sometimes called a neutral filter, or a smoked-glass filter. The function of that filter is to reduce the intensity of the image formed by these objective lenses, so that an intensity match can be had between that image and the target, and both the image formed by the objective lenses and the plane of that target is made visible to the observer or operator of that instrument by an additional optical system in that called the eyepiece system, which focuses on that plane.

The court concluded (23 CCPA at 245):

> We think the record in the case at bar establishes that the pyrometers here involved can be operated, for the purpose of ascertaining temperature measurements, only through the use of an optical system which, when being used, aids the human eye.

The manner in which the pyrometer aids the eye is essentially similar to the manner in which the autocollimator aids the eye. Both of these devices create multiple images and each device measures optically the variation or deviation between such images. Also similar to the autocollimator from the standpoint of "aid to vision" is the optical level that was held in Chas. Kurz Co. v. United States, supra, 57 Cust.Ct. 90, to be properly classified as an optical measuring instrument. The optical level there involved—like the autocollimator—was used to determine the flatness or straightness of surfaces. The instrument utilized a liquid-filled vial containing a free-floating air bubble and was moved from one position on the surface in question to another. With the aid of a prismatic optical system, an observation was made of any change in the air bubble's position. Flatness or straightness of the surface was manifested by two half-bubble images forming a perfect semi-circle. The optical level thus resembles the autocollimator to the extent that it created a double image from which variations from flatness were measured optically. This double image, it may be added, was held in *Kurz* to be an aid to human vision—thus refuting plaintiff's argument here that a double image must of necessity distort rather than aid vision. Also pertinent on this latter aspect is Willoughbys Camera Stores, Inc. v. United States, supra, 30 Cust.Ct. 76, in which it was held that a pocket range finder which produced a double image to permit the user-photographer to more accurately focus his camera was an optical instrument.

Nor is there merit to plaintiff's argument that the autocollimator is not an optical measuring instrument because it gives rise to angular rather than "dimensional" measurements. We find no authority—and none has been called to our attention—limiting optical measuring instruments to those which express measurements in linear or dimensional units. On the contrary, in the *Pyrometer* case, supra, 23 CCPA 242, the optical measuring instrument was a temperature measuring device which gave rise to measurements expressed in degrees Fahrenheit.

In summary, we hold that the collector's classification under paragraph 228 (a) is correct. And this result would not differ even if the autocollimators were

also encompassed by paragraph 360, which provides for scientific or laboratory instruments. This is due to the fact that paragraph 360 is relatively less specific than the provision for optical measuring instruments in paragraph 228(a). United States v. National Freight Co., 23 CCPA 138, 140, T.D. 47993 (1935); The Bendix Corporation v. United States, supra, 57 Cust.Ct. at 197–198.[6] As for plaintiff's alternate claim for classification as an article having as an essential feature an electrical element or device under paragraph 353, the doctrine of *ejusdem generis* precludes assessment of the imports under that provision. On this question, the following holding of the appellate court in United States v. Pyrometer Instrument Co., 21 CCPA 376, 378–379, T.D. 46910 (1934), is very much in point:

It will be observed that said paragraph 353 enumerates a number of the articles which are intended to be included therewithin, "such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs." We are unable to conclude that these pyrometers, where only the function of the electric element is to emit light, is "such as" or like, any of the articles enumerated in the paragraph. In said enumeration, the articles are such as receive their operating power from electric current, and which are commonly designated as electrical equipment, such as electric fans, or electric heaters, or electric locomotives. Here, however, the electric bulb and battery perform no function except to serve as a basis for the comparison which the eye makes, by use of the instrument.

The protest is overruled and judgment will be entered accordingly.

6. We also note that the provision for "optical instruments" in subpart (b) of paragraph 228, which is patently less difficult to satisfy than the provision for "optical measuring instruments" here in issue, has also been held to be more specific than

paragraph 360. E. g., Manca, Inc. v. United States, 42 Cust.Ct. 92, 97–98, C.D. 2071 (1959), affirmed 47 CCPA 103, C.A.D. 738 (1960); Manca, Inc., et al. v. United States, 39 Cust.Ct. 444, 446, Abstract 61229 (1957).