(C.D. 3994)

SUMITOMO SHOJI NEW YORK, INC. *v.* UNITED STATES

---

United States Customs Court, First Division

(Decided April 8, 1970)

*Rode & Qualey* (*John S. Rode* of counsel) for the plaintiff.
*William D. Ruckelshaus*, Assistant Attorney General (*Glenn E. Harris*, trial attorney), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: This case concerns the proper tariff classification of certain mirrors that were imported from Japan in August 1963. They were classified by the collector under the provisions in paragraph 228 (b) of the Tariff Act of 1930, as modified (T.D. 52739, T.D. 52820), covering mirrors for optical purposes and assessed duty of 35 percent ad valorem.[1]

Plaintiff challenges this classification and claims that the articles are properly classifiable under paragraph 223 of the 1930 act, as modified (T.D. 54108), as sheet or crown glass made into mirrors, dutiable at the rate of 8½ cents per square foot, but not less than 19 percent ad valorem,[2] plus 2½ percent ad valorem (by virtue of paragraph 224, as modified (T.D. 52739, T.D. 52820)).[3]

The government contends that the merchandise was correctly classified by the collector but asserts alternatively that if it was not, it is dutiable under paragraph 228(b) as parabolic mirrors for searchlight reflectors, at the rate of 45 percent ad valorem.[4]

Thus, the issue is whether the imported mirrors constitute (i) mirrors for optical purposes within the meaning of paragraph 228(b) (as classified by the government); (ii) parabolic mirrors for searchlight reflectors within the meaning of paragraph 228(b) (as alternatively claimed by the government); or (iii) mirrors as provided for in paragraphs 223 and 224 (as claimed by plaintiff).

---

[1] Paragraph 228(b), as modified: "Mirrors for optical purposes * * * finished or unfinished, not specially provided for."

[2] Paragraph 223, as modified, covers "crown, and sheet glass, by whatever process made, when made into mirrors, finished or partly finished * * * [o]ver 384 but not over 720 square inches."

[3] Paragraph 224, as modified, imposes an additional duty of 2½ percent on "[c]rown, and sheet glass, and glass mirrors over 144 square inches in size, by whatever process made, when * * * beveled * * *."

[4] Paragraph 228(b) : "* * * [P]arabolic * * * mirrors for searchlight reflectors * * *."

The facts are these. The importations consist of finished parabolic mirrors of sheet glass or crown glass having a diameter of approximately 25 inches and a surface area of over 384 square inches and not over 720 square inches. The edges are beveled, and the mirrors have a hole in the center of approximately ¼ inch in diameter.

The mirrors were purchased by plaintiff for resale to a New York concern which in turn assembled them into certain rotating beam ceilometer systems that it had contracted to produce for the United States Weather Bureau. The rotating beam ceilometer system for which the mirrors were procured is a device that is designed to measure the height of clouds. It consists of a projector, a detector, and an indicator, and operates on the triangulation principle. The projector, located 300 to 1,000 feet from the detector, emits a collimated beam of light which, upon striking the base of a cloud, is reflected downward to the detector component of the system. The detector, in turn, transmits a signal to the indicator which translates the signal into a cloud-height measurement. By use of a modulated light beam, the ceilometer system provides measurement of cloud height both by day and by night. The system does not produce a picture of any object for visual inspection but does express to the eye a conclusion expressed on a cathode ray tube in terms of measured height by means of light.

The mirrors in issue are a necessary and integral part of the ceilometer system and are used in both the projector and the detector components of the system. In the projector, two mirrors are mounted back-to-back and rotate continuously in a vertical plane; in the detector, one stationary mirror is mounted horizontally. The holes in the center of the mirror serve, in the case of the projector, to receive the illuminating source, and in the case of the detector, for the mounting of a photoelectric cell.

The mirrors were produced by heating and "sagging" the glass blank over a template, and then annealing and polishing the glass; thereafter, the outside surface of the glass was silvered; copper was applied to protect the silvering; and finally, a coat of aluminum paint was applied over the copper. According to one of plaintiff's witnesses, the glass was of high quality, and the mirrors' specifications were very strict. The sole American producer of such mirrors at the time of trial was Bausch & Lomb of New York.

While the imported mirrors were used only in the ceilometer systems, the specifications for them originated with the Navy before World War I. With the exception of the center hole, parabolic mirrors made to those basic specifications were used at least into the period of World War II as searchlight reflectors per se. The Weather Bureau specifications to which the imported mirrors were made were captioned

"MIRROR, SEARCHLIGHT, GLASS PLATE, PARABOLIC," and an employee of plaintiff who testified for plaintiff at the trial referred to the mirrors, in correspondence with customs officials, as "Mirror Searchlight."

It appears from the testimony that the materials used in manufacturing the mirrors were considered in Japan to be too expensive to permit use of the mirrors in the usual type of searchlight. However, their use in this country was, at least originally, directed to that purpose, as the specifications themselves suggest. None of the witnesses knew exactly when the ceilometer was first developed, but according to defendant's witness, who was employed by Bausch & Lomb, that company had been selling such mirrors for ceilometer uses for at least five or six years, while the last record of a sale for "searchlight purposes" was "a number of years ago." He explained that searchlights built in recent years have used reflectors smaller than 25 inches in diameter because of improvements in lamp design.

In this factual setting, we consider first whether the imported mirrors were correctly classified by the customs officials as "mirrors for optical purposes." At the outset, it is clear that to fall within this category, the mirrors must be employed in the attainment of optical pursuits or objectives. E.g., *Willoughbys Camera Stores, Inc.* v. *United States*, 30 Cust. Ct. 76, 79, C.D. 1499 (1953). Thus, what must be determined is whether the ceilometer system in which the mirrors are used is intended to, and does, perform an optical function.

To qualify as a device performing an optical function, the device must possess several necessary characteristics. One such characteristic is that "the optical system of the instrument must aid human vision or create for inspection a picture or image of some object." *Engis Equipment Company* v. *United States*, 62 Cust. Ct. 29, 32, C.D. 3670, 294 F. Supp. 964, 967 (1969), and cases cited. See also *Summary of Tariff Information, 1929*, p. 552. Considering in this context (1) that the sole use of the ceilometer system is to measure the height of clouds through the use of the principles of triangulation, and (2) that it does not produce a picture of any object for visual inspection, we must conclude that it does not perform an optical function. Relevant is *United States* v. *Bliss & Co.*, 6 Ct. Cust. Appls. 433, T.D. 35980 (1915), which involved the interpretation of a 1913 Tariff Act provision for "optical instruments." The instruments involved consisted of three articles—azimuth mirrors, sextants and octants. The azimuth mirror was mounted on a compass for the purpose of checking its readings by comparing the known bearing of some object on land, or the sun or the North Star with the compass bearing, the difference between the known bearing and compass bearing being the angular error of the

compass. The octant and the sextant were navigational instruments to measure the angular distance between a celestial body and the horizon. The sole purpose of the azimuth mirror, octant and sextant was to enable the location of ships and other objects to be ascertained and determined by angular measurements. The court held that the instruments were not optical instruments, stating (p. 440):

> * * * They are not designed for experimentation or investigation in the vast field of the phenomena of light. They contain appliances, glass prisms principally, that, taking advantage of known properties of light rays, reflect or refract them upon a prepared surface or plate for the sole purpose of measuring certain angles, the measurement of which, being correctly determined, enables a navigator to correct the error of the magnetic needle and determine the accurate location of his vessel at sea. *They do not of themselves, nor are they designed to, directly or indirectly, aid vision. Their function is not to produce for optical inspection a picture of the sun or any heavenly or other object, thereby in any sense assisting or increasing the sense of sight, but rather they present to the vision a desired mathematical conclusion which is expressed upon an instrument in degrees by means of light.* They apply principles or laws discovered and established by prior investigation in the science of optics for the purpose of producing a result not optical but mathematical, viz, the measurement of an angle. [Emphasis added.]

Here, similarly, the ceilometer systems do not of themselves, nor are they designed to, aid vision. Their function is not to produce for inspection a picture of the clouds or other object, thereby assisting or increasing the sense of sight, but rather they present to the vision a desired mathematical conclusion upon an instrument by means of light. See also *Henry Wild Surveying Instrument Supply Co. of America et al.* v. *United States*, 32 Cust. Ct. 91, C.D. 1586 (1954).

*Engis Equipment Company* v. *United States, supra*, 294 F. Supp. 964, on which defendant relies, is quite different. In that case we held that an instrument known as an autocollimator aided vision since its purpose was to determine the flatness or straightness of a surface that may be too subtle for the human eye to detect. This was accomplished by an operator viewing real and reflected images through the eyepiece of a microscopic unit and then taking a reading. By contrast, the purpose of the ceilometer system is to measure the height of clouds—which purpose is accomplished not through viewing a picture or image of any object, but rather through expressing to the eye a conclusion expressed on a cathode ray tube in terms of measured height by means of light.

This brings us to the government's alternative claim that the importations are dutiable under paragraph 228(b) as "parabolic mirrors for searchlight reflectors." The merchandise concededly consists of

"parabolic mirrors." Thus, the question is whether the mirrors are "for searchlight reflectors." If chief use is the determining factor as to whether the imported mirrors are "for searchlight reflectors," they meet the test. Two of every three such mirrors incorporated in a ceilometer system are used in the projector which emits a collimated beam of light that, upon striking the base of a cloud, is reflected downward to the detector component of the system. In view of this characteristic, the projector clearly falls within the common meaning of a "searchlight." For a "searchlight" is an apparatus, usually consisting of a light and reflector, for projecting a powerful beam of light of approximately parallel rays in any direction. See e.g., *Webster's New International Dictionary* (2d ed. 1948) ; *The American College Dictionary* (Random House, N.Y., 1962). If suitability is the determining factor, then the mirrors are obviously suitable for searchlight reflectors. Further, if the provision should be construed to mean mirrors *designed* for searchlight reflectors, the record is again clear that the mirrors in issue are so designed.

In short, we hold that the importations constitute "parabolic mirrors for searchlight reflectors" within the meaning of paragraph 228(b), as alternatively claimed by the government. However, the record establishes that paragraph 223, on which plaintiff relies, also describes the importations for the following reasons : First, the specification to which the mirrors were produced makes it clear that their dimensions caused them to fall within the surface and range specification in the claim. In addition, they were made of sheet or crown glass, and were beveled. Hence, the last remaining question is whether or not paragraph 228(b) or paragraph 223 takes precedence.

Paragraph 223, under which plaintiff claims, covers sheet and crown glass when made into mirrors by whatever process. The only specificity in the provisions arises not from its coverage, which is extremely broad, but from the subdivision of that coverage solely for rate purposes (i.e., the subdivision by surface area). On the other hand, not only must the mirrors in paragraph 228(b) be parabolic mirrors, they must also be chiefly used (or suitable for or designed for) searchlight reflectors. Clearly the provision in paragraph 228(b) for "parabolic mirrors for searchlight reflectors" is more specific than paragraph 223.

Since no reliquidation may be had at the higher rate applicable to "parabolic mirrors for searchlight reflectors,"[5] the protest is overruled without affirming the classification by the collector. Judgment will be entered accordingly.

[5] *Innis Speiden & Co.* v. *United States,* 14 Cust. Ct. 121, 126, C.D. 924 (1945) ; *Randolph Rand Corp., et al.* v. *United States,* 52 Cust. Ct. 107, 113, C.D. 2445 (1964), aff'd on other grounds, 53 CCPA 24, C.A.D. 871 (1966).