(C. D. 1386)

R. J. SAUNDERS & CO., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided January 17, 1952)

*Jordan & Klingaman* (*Edward F. Jordan* of counsel) for the plaintiff.
*Charles J. Wagner*, Acting Assistant Attorney General (*Joseph E. Weil*, special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

OLIVER, Chief Judge: The merchandise at bar was assessed for duty at 45 per centum ad valorem under the provisions of paragraph 228 (b) of the Tariff Act of 1930 as a microscope. The plaintiff claims it to be properly dutiable at 20 per centum ad valorem as a camera under paragraph 1551, or at 15 per centum ad valorem under the first or third provision of paragraph 353, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as (1) articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, or (2) articles having as an essential feature an electrical

element or device. The pertinent parts of the paragraphs are as follows:

PAR. 228. (b) * * * microscopes, all optical instruments * * *.

PAR. 353. [First provision] All articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy;

PAR. 353. [Third provision] articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs;

PAR. 1551. Photographic cameras * * *.

Plaintiff's counsel in its brief while not abandoning its claim under paragraph 1551 as a camera, does not press this claim.

In addition to supporting the collector's classification as a microscope, the Government, in its brief, has argued that if held not to be dutiable as a microscope, the merchandise is properly dutiable under paragraph 360 of the Tariff Act of 1930, as a laboratory instrument, apparatus, utensil, or appliance, and urges that, if so found, the protest should be overruled without affirming the classification of the collector.

In a reply brief, plaintiff contends that the merchandise is not dutiable under paragraph 360, principally upon the theory that to be so dutiable it must be used in pure science and not, as in this case, in applied science. Plaintiff further contends that if its protest is not sustained under the paragraphs originally claimed and the merchandise is found to be neither properly dutiable as a microscope nor a camera, that it is a combination of both, being two separate and distinct articles included in a single unit, and that it would not be properly dutiable as either of the separate articles thus combined but would be a new article not provided for.

The article before us is bought and sold in the trade under the designation "electron microscope." In physical appearance, it does not resemble in any degree the common light microscope. It is a large, white enameled metal cabinet, looking more like a large automatic washing machine than anything else. While the record does not give its weight, it will be safe to assume that it weighs upward of 500 pounds. It has a large circular glass-covered opening about 8 inches in diameter set at an angle at the top. This is known as the fluorescent viewing screen. Set at various points on the slanting top of the cabinet are various knobs or controls which control the operation of the apparatus. The ordinary light microscope of common use consists of glass lenses, usually capable of focusing on the object or specimen under examination, such object usually being placed on a glass slide for examination through a series of lenses. The object or specimen, in magnified form, is actually viewed by the observer. The presence and use of lenses is seemingly an essential feature of the ordinary light microscope. There are no lenses, as that term is commonly

understood, in the imported article. The apparatus before us is described on the invoice as "parts for electron image producer." These parts, however, were assembled after importation into the finished article, as shown in the photograph before us (plaintiff's illustrative exhibit A). In other words, it was the entire apparatus imported in knocked-down form ready for actual assembling after importation.

A description of the apparatus and its operation was given by a representative of North American Philips Co., Inc., the importer. The protest was filed in the name of the customs broker who made the entry. This witness (Mr. Buhler) was familiar with the operation of this instrument and prepared a diagram (illustrative exhibit B) which was used as a basis for describing its operation. The large glass-covered opening on the top is described as a fluorescent viewing screen which is at one end of a column which extends into the article. At the rear of this column is an electron gun which provides a source of electrons by means of a hot filament which is heated to incandescence by electrical energy. The electrons emitted from the glowing filament are given direction and speed by means of a high-voltage field. This high-voltage field is produced by means of a high potential applied between the electron gun and a plate. This electron gun is made up of a high-tension insulator at the end of which is a metallic cap with a small aperture behind which the filament, above referred to, is located. The electrons flow from the hot filament in a stream. The electrons move axially along the column. The force which propels the electrons in a directional stream is the high voltage supplied by a high-voltage generator. The specimen to be examined is located in the path of the electron beam in a suitable holder and in proper relation to one of the magnetic electrical coils employed for shaping or controlling the electron beam. The instrument can be used to view the shadow picture or, by use of a film or plate holder containing a sensitized film or plate, a permanent record can be made for later study. Either roll film or plates can be used in making this record. The entire apparatus operates under a vacuum as electrons will not pass through glass or air, and for this purpose a vacuum-pumping system is part of the general assembly.

In use, this apparatus produces enlarged shadow images of minute particles or areas in the general fields of chemistry or metallurgy or biology, in other words, all minute organic and inorganic materials. The actual specimen is not seen or photographed. What is seen is the effect of the electronic beam as modified by passing through the specimen.

When the film or plate holder is placed in the path of the stream of electrons, it blocks out the beam so that the shadow picture cannot be seen on the fluorescent screen. There are no focusing devices or

lenses used in connection with this plate or film holder. It is simply placed in the stream of electrons. In using the term "lenses," the witness explained:

I am not speaking of glass lenses, I am speaking of electron lenses which are equivalent in their function but not in composition, they are not glass.

And further:

[It] Does not refer to a glass lens in any sense of the word nor to the use of visible light.

In the Dictionary of Tariff Information, issue of September 1924, at page 540, it is stated:

Lenses and prisms are the primary constituents of optical instruments. Lenses are used for three purposes: (1) To concentrate and direct a ray of light (searchlight and automobile lenses); (2) to project a perfectly clear image on a sensitized plate (photography) or screen (motion pictures); (3) to magnify an image so that greater detail may be observed by the eye.

In using this apparatus to examine a pigment, it appears that the operator would not see the specimen, as would be the case in an ordinary light microscope, but would see on the screen "an area with light, dark and gradations of light which would be *representative* of the pigment particle or particles as the case may be and the background material or mounting material." [Italics added.] (R. 79.) "It gives you a shadow picture * * * which represents the specimen." (R. 40.)

When asked whether at any time the actual specimen would be seen on the viewing screen, the witness replied (R. 44):

No, it would be invisible to you because the radiation employed would not affect the retina of your eye.

And further (R. 42):

I can even say you don't see the beam, you see the effects of the beam.

It may be assumed that a microscope is an optical instrument. Knight's American Mechanical Dictionary, Volume II, defines it as "An optical instrument by which objects too small to be viewed by the naked eye may be seen and examined." Webster's New International Dictionary, Second Edition, 1948, defines it as: "1. An optical instrument, consisting of a lens, or combination of lenses, for making enlarged or magnified images of minute objects." Optical instruments are designed exclusively to deal with rays of light. (In re protest of Scientific Shop, Abstract 20751, T. D. 29618.)

The plaintiff's witness defined an optical instrument, as ordinarily considered, as employing visible light and glass lenses. The instrument before us does not employ visible light or glass lenses. It does not produce an optical result. The result obtained is more in the nature of a measurement or light and shadow record for translation

or interpretation by a skilled technician. The operator looks at the screen to view the image, not into the instrument. (R. 90.)

In considering optical instruments, the Summary of Tariff Information, 1929, referring to paragraph 228 of the Tariff Act of 1922, comments (p. 552):

**Description and uses.**—Optical instruments are primarily used to aid or supplement human vision; they also include apparatus which depends for its operation on the passage of light through prismatic or lenticular optical glass. *Lenses and prisms are the fundamental parts of optical instruments.* [Italics supplied.]

In *United States* v. *Bliss & Co. et al.*, 6 Ct. Cust. Appls. 433, T. D. 35980, the court said (p. 439):

It is said in Ganot's Elementary Treatise on Physics that an "optical instrument" means "any combination of lenses, or of lenses and mirrors," and that such instruments may be divided into three classes, viz:

1. Microscopes, which are designed to obtain a magnified image of any object whose real dimensions are too small to admit of its being seen distinctly by the naked eye.

The article before us is called an electron microscope. Calling it a microscope does not, of itself, make it such. In like manner, calling a magnetic field a lens, as is done in connection with this apparatus, does not make it a lens for tariff purposes.

In *United States* v. *Arthur H. Thomas Co.*, 22 C. C. P. A. (Customs) 120, T. D. 47105, the article before the court was called a "microphotometer." The court observed (p. 122):

* * * The evidence is clear and positive that this instrument does not operate on the same principle or perform the same function as a photometer, and that it is misnamed, and should be called a "densitometer", inasmuch as it measures the density of lines on the spectrum; that it is unlike a photometer inasmuch as a photometer is an instrument for comparing the intensities of two light sources, by some physical means, and that the instrument at bar performs its function by the utilization of heat rays * * *. It is shown that this machine may be used "for study of the density of electron diffraction rings, which are made by electrical means, *electron impact on a photographic plate.* The plate is affected the same as it would be by light, but it is not light—and density distribution on the plate; and you can study it by the use of this device." [Italics supplied.]

The unassembled instrument before us is described on the invoice as "parts for electron image producer." It might well be described as an "image producer" rather than as an "electron microscope."

The article under consideration is not the ordinary light microscope of commerce. It contains no glass lenses. What are referred to as lenses in the imported apparatus are magnetic fields. Just as these magnetic fields called lenses are not such in the ordinary meaning of that term, so, in our opinion, this electronic microscope is not a microscope, as that term is used in paragraph 228 (b) of the Tariff Act of 1930.

Plaintiff claims this apparatus properly dutiable as a camera. (Paragraph 1551, Tariff Act of 1930.) This claim is not urged by

plaintiff in its brief. It seems fairly obvious that while a plate or film holder is at times used to make a permanent record of the effect of the electronic beam, it is a film holder and not a camera. Plaintiff's witness stated: "I am inserting a film holder only. It is not a camera." (R. 49.) And again: "Camera was improperly used." (R. 50.) The imported article is not a camera.

Plaintiff urges that even if this article is found to be a microscope, it is more than a microscope because it is also a camera; that it is also more than a camera and, therefore, not properly dutiable as either. This claim is not sustained because we hold it to be neither a microscope nor a camera and consequently it cannot be a combination of both.

Counsel for the defendant contends that if the imported merchandise be held not dutiable as a microscope, as classified by the collector, the court should find it to be properly dutiable under the provisions of paragraph 360, Tariff Act of 1930, as "Scientific and laboratory instruments, apparatus, utensils, appliances * * * and parts thereof." In so holding, we are asked to overrule the protest without sustaining the collector's classification. In reply, counsel for plaintiff points out that under numerous decisions in this court and in our appellate court, it has been repeatedly held that to be dutiable under paragraph 360, *supra*, the instruments, apparatus, utensils, or appliances must be used in pure, as opposed to applied, science. *W. L. Conover* v. *United States*, 17 C. C. P. A. (Customs) 324, T. D. 43743; *United States* v. *Adlanco Industrial Products Corp.*, 21 C. C. P. A. (Customs) 249, T. D. 46778. The record in the present case establishes that these electronic microscopes are used to examine minute organic and inorganic materials chiefly in laboratories in industry, chemistry, metallurgy, biology, and similar fields. (R. 32, 33.) They are used in industrial, hospital, university, and police laboratories. It thus seems clear that their use is not exclusively or chiefly in the field of pure science and, therefore, they would not come within the provisions of paragraph 360, Tariff Act of 1930.

The remaining claim of plaintiff is for classification under the provisions of paragraph 353, the first provision of which covers "All articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy."

The third provision of this paragraph provides for "articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs."

It has been held that the first provision, as set forth above, is a use provision and that the third provision is not a use provision. *United States* v. *R. W. Cramer & Co., Inc.*, 22 C. C. P. A. (Customs) 45, T. D. 47049. The record establishes that while the apparatus

here before us does not produce electrical energy it does, in fact, modify, rectify, distribute, and control electrical energy (R. 60, 61). In fact, it would not function to produce the result for which it was made without such control of electrical energy.

The record also establishes that the article has as an essential feature certain electrical elements or devices including transformers, a high-voltage generator, vacuum pump motor, heaters, and mercury jet pumps (R. 62, 63). These facts, which are not contradicted, bring this article squarely within the provisions of paragraph 353 for "All articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy * * *" as well as for "articles having as an essential feature an electrical element or device."

On the basis of the record here before us, we hold that the article here in question comes within the purview of paragraph 353, Tariff Act of 1930, under the provisions therein for (1) "All articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy"; and also for (2) "articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs"; and that inasmuch as the first provision of said paragraph is a use provision, the merchandise here in question is more specifically provided for therein. The protest is sustained and the merchandise is accordingly held dutiable under paragraph 353, as modified by the General Agreement on Tariffs and Trade (T. D. 51802), at the rate of 15 per centum ad valorem, as claimed. Judgment will issue accordingly.