(C.D. 2759)

THE BENDIX CORPORATION v. UNITED STATES

United States Customs Court, First Division

(Decided September 12, 1966)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Richard J. Kaplan* and
*Harold L. Grossman*, trial attorneys), for the defendant.

Before OLIVER, NICHOLS, and WATSON, Judges

NICHOLS, Judge: The merchandise involved in this case is designated on the invoice and entry papers as "Polarmatic 62." It was imported from England and entered at the port of Cincinnati on May 21, 1963.[1] It was classified as a polarimeter and assessed with duty at 50 per centum ad valorem under paragraph 228(a) of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739. Plaintiff claims that the merchandise is properly classifiable as a scientific or laboratory instrument at 22½ per centum ad valorem under paragraph 360 of said tariff act, as modified by T.D. 55816. An alternate claim for classification as an article having as an essential feature an electrical element or device under paragraph 353, as modified, has not been pressed and is deemed abandoned.

The Government claims that the merchandise was properly classified as a polarimeter under paragraph 228(a), as modified, or, if it is not a polarimeter, that it is dutiable under said paragraph as an optical measuring instrument.

The pertinent provisions of the Tariff Act of 1930, or said tariff act, as modified, are as follows:

Tariff Act of 1930:

Par. 228. (a) Spectrographs, spectrometers, spectroscopes, refractometers, saccharimeters, colorimeters, prism-binoculars, cathetome-

<hr>

[1] This case was heard and submitted before Judge Richardson at Cleveland on November 6, 1964. Plaintiff's brief was filed on April 8, 1965, and defendant's brief on January 6, 1966. This case was resubmitted before the first division as presently constituted on May 12, 1966.

ters, interferometers, haemacytometers, polarimeters, polariscopes, photometers, ophthalmoscopes, slit lamps, corneal miscroscopes, optical measuring or optical testing instruments, testing or recording instruments for ophthalmological purposes, frames and mountings therefor, and parts of any of the foregoing; all the foregoing, finished or unfinished, 60 per centum ad valorem.

Paragraph 228(a), as modified by T.D. 52739 and T.D. 52820:

Spectrographs, spectrometers, spectroscopes, refractometers, saccharimeters, colorimeters, cathetometers, interferometers, haemacytometers, polarimeters, polariscopes, photometers, ophthalmoscopes, slit lamps, corneal microscopes, optical measuring or optical testing instruments, testing or recording instruments for ophthalmological purposes, frames and mountings therefor, and parts of any of the foregoing; all the foregoing finished or unfinished_____ 50% ad val.

Paragraph 360, as modified by T.D. 55816:

Scientific and laboratory instruments, apparatus, utensils, and appliances (including surveying and mathematical instruments), and parts thereof, wholly or in chief value of metal, and not plated with gold, silver, or platinum, finished or unfinished, not specially provided for:

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

Other (except analytical weights; balances; laboratory scales; and laboratory instruments, apparatus, and appliances, for determining the strength of articles or materials in compression, tension, torsion, or shear; and parts of any of the foregoing).  22½% ad val.  * * *

It was stipulated at the trial that the article herein is composed in chief value of metal and is not plated with gold, silver, or platinum.

Plaintiff's chief claim is that the imported merchandise (hereinafter called the Polarmatic) is not a polarimeter within the meaning and intent of paragraph 228(a), *supra*, but is more than a polarimeter. Defendant contends that it is but a technologically advanced, electronically sophisticated version of a polarimeter.

Plaintiff called two highly qualified witnesses: David Bandel, director of engineering of the Cincinnati division of The Bendix Corporation, and Murray Goodman, professor of chemistry at the Polytechnic Institute of Brooklyn.

Dr. Bandel had obtained a bachelor of science degree from George Washington University in 1939, a master of science degree in chemistry from the Polytechnic Institute of Brooklyn in 1946, and a Ph. D. in chemistry from the same institute in 1950. He has engaged in chemical research and development and technical administration

with the United States Department of Agriculture, the United States Army Chemical Center, and the Austenal Laboratories in New York City. He was a research associate and post-doctoral fellow at the Polytechnic Institute of Brooklyn, and has been with American Machine & Foundry Co., Springdale, Conn., and Tracerlab, Inc., in Massachusetts. He has held his present position since 1963.

Dr. Goodman received a bachelor of science degree from Brooklyn College in 1949 and a degree of doctor of philosophy in chemistry from the University of California in 1952. He has been a fellow at the Massachusetts Institute of Technology and Cambridge University in England and is the editor of the journal "Biopolymers." He is engaged in teaching and research on the subject of polymers with biological significances and has been on the faculty of the Polytechnic Institute since 1956.

According to the record, "Polarmatic" is the trade name of a so-called spectropolarimeter imported from the Bendix Electronics Co. in England. "62" is a model number. Dr. Goodman stated that the first commercial spectropolarimeter came into existence in 1953. However, the term "spectropolarimeter" appears in the 1930 edition of Webster's New International Dictionary, which defines it as a combination spectroscope and polarimeter "for determining the rotary power of solutions."

The Scientific Apparatus Makers Association represented to the Congress in 1929 that a spectropolarimeter was one of the products a domestic instrument manufacturer had made in the last 6 years and was then prepared to make. Tariff Readjustment Hearings, Committee on Ways and Means, House of Representatives, Seventieth Congress, Second Session, volume III, schedule 3, Metals and Manufactures of, page 2261. What were the attributes of this article has not been put before the court, and we have no means even to speculate. If it was the merchandise at bar or any earlier version or model thereof, plaintiff's burden would be greatly eased, because then the decision of the Congress not to enumerate it in paragraph 228 would have more significance for us. But it hardly seems possible it could have incorporated the sophisticated electronic devices of the instant model, and that it did anything more than the quoted definition says it did, cannot be assumed. We deal below with the Government's use of this old definition to show that the article is an "optical instrument." First we turn to the question whether it is a polarimeter.

It is well settled that the meaning of an *eo nomine* designation in a tariff act must be determined as of the date of the enactment of the act, but that the term will embrace merchandise not then known to commerce, provided the new article possess an essential resemblance to

the articles named in the particulars which the statute establishes as the criteria of classification. *Davies Turner & Co.* v. *United States,* 45 CCPA 39, C.A.D. 669; *Smillie & Co.* v. *United States,* 12 Ct. Cust. Appls. 365, T.D. 40520; *Hoyt, Shepston & Sciaroni et al.* v. *United States,* 52 CCPA 101, C.A.D. 865. Paraphrasing the language of the *Davies Turner* case, the issue here is whether the term "polarimeter" would have been understood in 1930 as including the Polarmatic had it been in existence at that time.

Since both these instruments use polarized light, the following definition of "polarization" is included for reference:

Webster's New International Dictionary (1958 edition):

*Optics.* The act or process of affecting light or other radiation in such a way that the vibrations assume a definite form; * * *. In ordinary light the vibrations are supposed to be in all directions perpendicular to the ray; in polarized light, the paths of the vibrations (all in a plane perpendicular to the ray) may be straight lines, circles, or ellipses. The light is then said to be *plane-polarized, circularly polarized,* or *elliptically polarized,* and the phenomenon is called *plane polarization, circular polarization,* or *elliptical* (or *elliptic*) *polarization,* respectively. Light may be plane-polarized by reflection or refraction at nonmetallic surfaces, or by transmission through crystals showing double refraction. When plane-polarized light passes through certain media called *optically active,* it is changed. Usually, as with quartz or a sugar solution, this change consists in *optical rotation,* in which the *plane of polarization* (that is, the plane which contains the direction of vibration and the direction of the ray) is rotated through a definite angle depending on the nature of the medium, the length of the layer traversed, and the wave length of the light. * * *

Before summarizing the lengthy testimony on the construction, operation, and use of the Polarmatic, it is pertinent to consider what is meant by the term "polarimeter."

The following definitions appear in Webster's New International Dictionary, 1958 edition:

polarimeter, *n.* *Optics.* a An instrument for determining the amount of polarization of light, or the proportion of polarized light, in a partially polarized ray. b A polariscope for measuring the amount of rotation of the plane of polarization, esp. by liquids.

polariscope, *n.* *Optics.* An instrument for studying the properties of, or examining substances in, polarized light. It consists essentially of a combination of two Nicol prisms or other polarizing devices, called the polarizer and the analyzer. When the two have their planes of vibration at right angles to each other they are said to be crossed, and the light emerging from the polarizer is extinguished by the analyzer unless an optically active substance intervenes.

See also Kirk-Othmer Encyclopedia of Chemical Technology, volume 10, page 878; Instrumental Methods of Analysis (3d ed.) by Willard, Merritt and Dean, Van Nostrand (1958).

A photograph of a typical polarimeter was received in evidence in this case. (Exhibit 11.) Such an instrument employs a sodium lamp; a polarizer and an analyzer, consisting of Nicol prisms; and a means for rotating the prisms mechanically. It is designed to measure the angle of rotation of a given wave length of polarized light passing through a particular sample. A light beam is polarized by the first Nicol prism, and the sample causes it to rotate as it passes through The operator mechanically moves the second Nicol prism until the intensity of light seen in two half fields balances. By means of a measuring scale, the operator can tell how many radians or degrees he had to move the second prism to compensate for the rotation of the light passing through the sample. The angle of rotation obtained, when related to other known constants, will give a useful measurement of the concentration of the sample. The polarimeter is used commercially in determining concentration and purity, particularly in the sugar industry. We note that paragraph 501 of the Tariff Act of 1930 prescribes polariscope tests of sugar. The polarimeter ordinarily operates at only one wave length and gives an absolute number for the angle of rotation at that wave length. The witnesses said that measurements of the angle of rotation of polarized light at a different wave length or lengths could be obtained with a polarimeter only by switching to different light sources.

The Polarmatic consists of several parts housed in cabinets, containing an optical unit, a combined control and power unit, and an amplifier. The units are interrelated in a complex way so that any signal or perturbance in one area must go through the entire system to reestablish itself. All parts must be used together; none of the components can be removed if the device is to remain operative.

Both witnesses described the operation of the Polarmatic. The within summary is believed sufficient for the decision. However, the testimony left an unfilled communication gap between judicial knowledge of physics (say, high school level) and the knowledge necessary for complete understanding.

According to the record, the optical unit contains a light source (a Xenon lamp), two slits, two mirrors and two prisms forming together a monochromator and cross-polarizing system, a sample cell, a Faraday modulator cell, a Faraday compensator cell, and a photomultiplier. (Exhibit 9.) The Xenon lamp furnishes a continuous spectrum of light, starting from the visible and going through the ultraviolet. Prism 1 polarizes light horizontally and prism 2 vertically, so that, in the absence of any sample in the sample cell, the light comes out the other end reduced to a minimum or null point. The mirrors are rotated continuously by an electric motor and mirror 1 selects a series of wave lengths by means of the angle of the mirror

in relation to the light source. When a sample is introduced and the system is in operation, light goes from the light source through a slit and a particular wave length selected by the rotation of mirror 1 is polarized by prism 1 and passes through the Faraday modulator cell which causes the polarized beam to oscillate around a center or null point. The beam then passes through the sample and, if the sample is optically active, it will rotate or shift. The oscillation will change so that it is no longer occurring symmetrically about the original null point. The light then passes into the Faraday compensator cell which, by an electro-optical effect, induces a rotation in the beam, which is exactly equal and opposite in direction to that induced by the sample. In other words, the compensator compensates for the change caused by the sample. The light is then transmitted through prism 2 and mirror 2 to a photomultiplier, which converts it into a minute electrical signal which is sent to the remainder of the electronic equipment for processing. It controls the Faraday compensator cell by introduction of a DC current sufficient to compensate the rotation of the beam and reestablish a null point. The current of the flow through the compensator then is the electrical analog of the rotation of light induced by the sample and is read by an electrical meter. By proper calibration, the relationship between the current and the optical rotation of the sample can be found. The results are registered by a potentiometric type recorder by means of a tracing or line, from which the reader can tell the variation of the optical rotation as a function of wave length. The recorder indicates the magnitude of the effect through the entire range of wave lengths, and from the nature of the rotation as a function of wave length, scientific deductions can be made.

Another meter reads out the transmission or the absorption of the material under investigation, that is, the amount of light which is physically transmitted through the sample, not rotated but transmitted.

Dr. Bandel described another article called "The Bendix Automatic Polarimeter," whose purpose is to measure the angle of rotation of the plane of polarization of light passing through a specimen at a given wave length. It has no monochromator and does not scan. In operation, light from a light source at a fixed wave length goes through an interference filter which passes a narrow width or wave length to a polaroid polarizer which polarizes the light. The light goes to a Faraday modulator which oscillates it, after which it is passed through the sample. If there is optical activity, the plane of polarized light will be rotated. It then goes into the compensator and is rotated in an equal amount, but in an opposite direction from that imposed on the beam by the sample. It then goes to a photomultiplier. The automatic polarimeter uses the electronic null principle in the same way

that the Polarmatic does. The angle of rotation is read electrically. Either a volt meter is used to tell the voltage developed across a certain resistor or a digital volt meter is used to give the numbers directly. By looking at the properly calibrated dial, the operator reads the angle of rotation.

The automatic polarimeter is used in the sugar industry to determine the concentration of sugar.

Dr. Bandel testified that the automatic polarimeter performs the functions of a polarimeter at the same measurements, but said it was not a polarimeter as he understood it, which was the type shown by exhibit 11. The automatic polarimeter uses electronics in some of the same ways as the Polarmatic while the standard polarimeter employs electricity only for the light source.

The references herein to "polarimeter" are to an instrument like exhibit 11. The automatic polarimeter will be referred to as such.

The purpose of the Polarmatic is to give a reading of the angle of rotation of polarized light passing through a sample as a function of wave length, scanning the wave length region and measuring specifically the variation in the rotation of polarization for all wave lengths. The spectrum is scanned automatically and recordings at different wave lengths are done continuously, simultaneously, and electronically. While at any given split second, only one wave length passes through the sample, the Polarmatic is not designed to give a measurement at a specific wave length, but to show the continuous change in rotation as a function of wave length. The court understands that the changes in wave lengths from one part of the spectrum to another are gradual and continuous, so the scanning of the Polarmatic is complete.

The Polarmatic is not used to investigate the phenomena or properties of light, but the effect of the interaction of light with the sample. The Polarmatic is used in the study of complex natural materials which are optically active, such as proteins or steroids. Information is thus obtained which will assist, in collaboration with other approaches, in determining the molecular structure of complex compounds. Dr. Bandel explained:

Well, we start with the material which we believe will have an optical rotation. This is what this instrument is designed to do. We will then scan the spectrum and obtain a curve of the variation of optical rotation with the wave length. From the shape of this curve, and other factors involved, we can infer certain features of molecular structure. A skilled biochemist can accomplish this.

Dr. Goodman testified that he used the Polarmatic "to study the specific rotation of complex molecules as a function of wave length in

order to describe certain features of absorption of asymmetric polarized light." He explained:

\* \* \* Since we deal with large molecules of biological interest, the absorption of light through this so-called Cotton effect is characteristic for helical structures, random structures, and many other organizations of molecular dimension, which we can then characterize by the position, that is the wave length of the absorption by the intensity of the absorption, and by the over-all shape of the asymmetric absorption band. \* \* \* This can only be done completely by using a continuous sweep. You cannot do this with discrete lines.

It could not be done with a polarimeter, for reasons indicated above.

Seven out of 22 Polarmatics imported by the plaintiff have been sold, 6 to universities and 1 to a Government research laboratory. According to Dr. Bandel, six are being used to study the optical rotatory dispersion of proteins and allied substances in university laboratories and one at Wright-Patterson Field to investigate the separation of isomers of metallo-organic compounds. In Dr. Bandel's opinion, they are being used in pure research because the only type of information derived from them has no obvious practical application but is confined to the solution of fairly esoteric problems. Neither he nor Dr. Goodman had ever known of anyone using such an instrument for anything but pure research.

From the record presented, it is clear that a polarimeter, such as exhibit 11, and the Polarmatic are very different in construction. The former is a comparatively simple device operated mechanically and visually. It operates at a single wave length, the null point is established mechanically, the human eye balances the intensity of light in two fields, and the results are read visually from a dial. It measures the angle of rotation of a given wave length of polarized light passing through a sample. A polarimeter cannot do everything a Polarmatic does: it cannot give a scan of the wave length and rotation; it cannot read extremely small rotations; it is limited to the visible portion of the spectrum.

The Polarmatic is "a very complex fusion of electrical measuring systems, and a rather ingenious electro-optical detecting system for rotation." It contains optical elements, prisms and mirrors, constituting the monochromator system, but they function only in connection with the electrical components. In the opinion of the witnesses, the Polarmatic is much more than a polarimeter, because it performs functions which could not be performed by a polarimeter; it has an extremely complex electronic system; it does not aid vision; the eye does not see what is going on; there is no place to put any device which would permit an operator to read out the type of rotations easily detectable by electronic means. Its use is mainly and entirely limited to scanning the entire spectrum, visible and ultraviolet,

operating at all wave lengths; the information it obtains of use to the operator is the continuous change in rotation as a function of wave length. A single measurement of an angle of rotation by the Polarmatic would have no real significance; it is necessary to scan the spectrum continuously, and not by "discrete" hops.

According to Dr. Goodman, spectropolarimetry is an entirely different field from polarimetry, because in spectropolarimetry—

* * * we are after the nature of absorption bands; asymmetric absorption bands which molecules, by virtue of their organization, by virtue of their asymmetric organization, produce. * * *

\* \* \* \* \* \* \*

* * * we can get information about molecular energetics from a spectropolarimeter that we cannot get from a polarimeter because this asymmetric absorption is related to electronic transitions, nature of geometry, and this is a completely different phenomenon that we are studying from what we study in a simple polarimeter of Exhibit 11.

Dr. Bandel had never known of a Polarmatic being used to study a sugar solution. He would use a polarimeter such as exhibit 11 for the analysis of sugar since it would be simpler and more convenient and satisfactory. While a Polarmatic could conceivably be used as a polarimeter, one would not normally so use it, because it is not adaptable to the type of measurements that are obtained with a polarimeter.

Clearly it is not a question of a simple, primitive device versus a development which is improved and more sophisticated. The polarimeter and the Polarmatic each has its own field of use in which it is more efficient than the other. Government counsel in cross-examination sought to develop that one could obtain readings at different wave lengths on a polarimeter by using different light sources. Apart from the slowness of such a procedure, readings for lengths between those used would have to be plotted on a curve between the "discrete variations" and might entirely miss an "absorption" between the lengths that the Polarmatic would detect. We do not agree, however, with plaintiff's counsel that the automatic polarimeter is an irrelevant consideration. It shows we must not rely too much on the sophisticated electronic devices in the Polarmatic as a means of distinguishing it from the polarimeter. We must look beyond the means employed to the ends achieved. It is the automatic polarimeter which is the development of the same article, having the same uses.

Tariff acts take into account technological developments, but where new and advanced articles, some operating electrically in place of manually, have been held to fall within specific tariff designations, they have resembled or taken the place of older or conventional articles.

In *United States* v. *Gehrig Hoban & Co., Inc., et al.,* 52 CCPA 32, C.A.D. 853, a sparking machine tool, which never touches the work,

but knocks off tiny particles of metal by means of a spark, was held to be a machine tool under the definition, a "machine * * * which employs a tool for work on metal." The court noted that it performed most of the functions of and directly replaced many conventional machine tools.

We have recently held that an electric toothbrush is classifiable as a toothbrush on the ground that Congress intended to include improved models. *Kaysons Import Corp.* v. *United States*, 56 Cust. Ct. 146, C.D. 2622. The article was bought and sold as an electric toothbrush and was used to brush the teeth, the only added function being an incidental massage of the gums.

In *J. E. Bernard & Co., Inc., et al* v. *United States*, 52 'Cust. Ct. 56, C.D. 2436, diamond files having a cutting surface of diamond were held dutiable under the provision for files or rasps of whatever cut since they had the same purpose as conventional steel files or rasps.

In a decision recently handed down, *United-Carr Fastener Corporation* v. *United States* (*Northern Screw Corp., Party in Interest*), 56 Cust. Ct. 347, C.D. 2648 (April 6, 1966, Appeal 5256 pending), the second division held that a "Tee Nut" was classifiable as a "nut" notwithstanding improvements and increased capabilities on the ground that it was designed to replace an older, less efficient method of performing the same function with the conventional nut, bolt, and washer.

*R. J. Saunders & Co., Inc.* v. *United States*, 49 CCPA 87, C.A.D. 801, involved electric dry shavers, which were held not classifiable as safety razors on the ground that the former were vastly different in operation and appearance from the latter.

In *Lanston Industries, Inc.* v. *United States*, 49 CCPA 123, C.A.D. 807, it was held that monophoto filmsetting machines were classifiable under a provision for "all typesetting machines" since, although they employed a new technique, they did not perform any function other than the single one of setting and composing type.

Plaintiff claims that the Polarmatic is no more a polarimeter than an "electron microscope" is a microscope, citing *R. J. Saunders & Co., Inc.* v. *United States*, 28 Cust. Ct. 39, C.D. 1386; *United States* v. *R. J. Saunders & Co., Inc.*, 42 CCPA 128, C.A.D. 584; *R. J. Saunders & Co., Inc.* v. *United States*, 45 CCPA 87, C.A.D. 678. In the first case, the court noted that the merchandise did not resemble in any degree the common light microscope. It was a large, white enameled metal cabinet, weighing upward of 500 pounds. It had a large circular glass-covered opening at the top, known as the fluorescent viewing screen. The specimen under observation was not seen or photographed but a stream of electrons passing through it projected a shadow picture of the effect of the electronic beam on the viewing screen or a sensitized film or plate. The court stated that the instru-

ment did not employ visible light or glass lenses; that it did not produce an optical result; and that the result was more "in the nature of a measurement or light and shadow record for translation or interpretation by a skilled technician." The court held it was not a microscope within the meaning of paragraph 228(b) of the Tariff Act of 1930.

In the subsequent cases, the Government conceded that the collector's classification of the article as a microscope was erroneous and contended that it was classifiable under paragraph 360, as a laboratory instrument, which contention was sustained.

We show below that the imported article is not an "optical instrument." The rather numerous specific enumerations in paragraph 228(a) would indicate that these enumerations are to be fairly strictly construed when not "optical instruments"; any extension to like or similar articles is not provided for and would frustrate the arrangement of the paragraph. The witnesses agreed that the article at bar is not known to them as a polarimeter. This testimony is only advisory, being as to "common meaning," but we would be bold to disregard it when the meaning to be determined is as to a piece of scientific and technical apparatus of which we have no judicial knowledge. The merchandise at bar has some attributes in common with a polarimeter. Both articles use the rotation of polarized light to measure the composition or structure of samples. If the testimony showed that the Polarmatic was commonly and commercially known as a polarimeter, we would probably so classify it, for tariff purposes, even though it was not invented in 1930. Clearly it is derived from the primitive polarimeter, and if it was called one in common speech, it would not be the application of the old term to a wholly different article. But the differences are so marked in composition, method of functioning, and uses, that those who deal with these articles will not call them polarimeters, according to the uncontradicted evidence. Therefore, neither should we. In the chapter on polarimetry in Instrumental Methods of Analysis, cited above (published in 1958, after the production of the Polarmatic), various types of polarimeters are described but none of them is anything like the Polarmatic. No mention is made of a spectropolarimeter nor of a Polarmatic. It is stated that the chief interest in polarimetry is to determine the concentration of substances and that the polarimeter is widely used in sugar analysis. This lends support to our understanding of the testimony herein that the Polarmatic is not a polarimeter and is used for an entirely different purpose. We hold that the involved article is not a polarimeter in the tariff sense.

We next consider defendant's claim that, if the imported instrument is not a polarimeter, it is an optical measuring instrument since it has

been held that the provision for optical measuring instruments in paragraph 228(a) is more specific than that for scientific instruments in paragraph 360. *United States* v. *National Freight Co.*, 23 CCPA 138, T.D. 47993. The collector having classified the merchandise as a polarimeter under paragraph 228(a), there is no presumption that it is an optical measuring instrument and the burden rests upon the Government to establish that it is. *United States* v. *White Sulphur Springs Co.*, 21 CCPA 203, 205, T.D. 46728; *United States* v. *Magnus, Mabee & Reynard, Inc.*, 39 CCPA 1, 7, C.A.D. 455.

The Government argues that the imported article, if not a polarimeter, is a combined spectroscope and polarimeter. This argument is based on dictionary definitions, Webster's New International Dictionary, 1927 and 1963 editions, and Funk & Wagnalls New Standard Dictionary, 1956 edition, which define a spectropolarimeter that way. The difficulty is that these definitions, as we have shown, must refer to something else because the merchandise at bar was first produced in 1953, and was unknown when such a definition first appeared. The merchandise at bar is not wholly or partly a spectroscope, which is an instrument for forming and examining optical spectra. A scientist uses a spectroscope to examine the properties of certain light, as e.g., from the sun, and to derive conclusions as to the light source. Here the light source is known and given and the light is used to study something else. We surmise the term "spectropolarimeter" *may* have been a term simply coined to describe an article which employed a spectrum of light as a spectroscope does, though for a wholly different purpose. Calling the imported article a spectropolarimeter does not make it one for tariff purposes, if it is not one. *United States* v. *Arthur H. Thomas Co.*, 22 CCPA 120, T.D. 47105; *Hensel, Bruckmann & Lorbacher, Inc.* v. *United States*, 20 Cust. Ct. 327, Abstract 52364. If, however, the spectropolarimeter as known in 1930 was the instrument we have before us, or its primitive ancestor, then the omission of the Congress, which knew of it, to mention it in paragraph 228(a) acquires significance. Either way, the definitions do not help the Government.

Not all instruments having optical features are optical instruments or optical measuring or testing instruments. *United States* v. *American Machine & Metals, Inc.*, 29 CCPA 137, C.A.D. 183; *Henry Wild Surveying Instrument Supply Co. of America et al.* v. *United States*, 32 Cust. Ct. 91, C.D. 1586. With the Polarmatic, the results sought are the effect caused by a specimen on polarized light, but such results could not be registered at all wave lengths from the visible to the ultraviolet in continuous sweep without the electronic features. However, the electronic features are subsidiary in that their use is to manipulate the light rays, measure, and record the data the rays obtain.

But the article is not an optical instrument since it does not aid vision directly or indirectly or produce a picture of an object for visual inspection, but uses the properties of light without direct employment of vision. *United States* v. *Bliss & Co.*, 6 Ct. Cust. Appls. 433, T.D. 35980; *United States* v. *Arthur H. Thomas Co.*, *supra.*

In the *Bliss* case, the court noted that in common understanding the term "optical" relates to the phenomena of both light and vision; that they are inseparable since light is " 'the sensation of which one becomes conscious through the optic nerve.' " (P. 440.) It held that azimuth mirrors, sextants, and octants were not optical instruments, pointing out that they were not designed for experimentation or investigation in the field of the phenomena of light; that they did not directly or indirectly aid vision; that their function was not to produce for optical inspection a picture of the sun or other object, but to present "to the vision a desired mathematical conclusion which is expressed upon an instrument in degrees [measured] by means of light," employing established principles of optics to produce a result not optical but mathematical, the measurement of an angle. "They do not aid vision, nor are they so intended." (P. 440.) This case involved the 1913 Tariff Act, but the *Thomas* case cites it with approval in construing paragraph 228(a) and 228(b) of the 1930 Tariff Act, the key word "optical" being the same in all three.

Here, measurements of angles of rotation of light, made in a continuous sweep through the visible and invisible spectrum, enable a skilled biochemist to infer certain features of molecular structures. The *Thomas* case plainly indicates that the employment of light and its properties to analyze material, not visually or with the eye, is not such employment in an optical or optical measuring instrument. That case involved merchandise which was invoiced as a "microphotometer" and classified as an optical measuring instrument. The court described it as follows (p. 122):

The type A microphotometer at bar records on a photographic film all the lines and the finest details which have been previously recorded on a spectrogram and makes visable details there recorded which would not otherwise show. The result obtained is accomplished by "a beam of light from an incandescent light passing through the plate on the spectrum." Certain lenses styled "objectives" concentrate the light, after it passes through the negative, onto a vacuum thermocouple, which is designated as the essential feature of the instrument. The thermocouple acts only in response to heat rays and the heat rays come from the incandescent light aforesaid. The current in the thermocouple is varied as the heat rays strike the lines of the spectrum on the plate. A galvanometer connected with the thermocouple, and a drum camera complete the operation.

* * * The evidence is clear and positive that this instrument does not operate on the same principle or perform the same function as a

photometer, and that it is misnamed, and should be called a "densitometer", inasmuch as it measures the density of lines on the spectrum; that it is unlike a photometer inasmuch as a photometer is an instrument for comparing the intensities of two light sources, by some physical means, and that the instrument at bar performs its function by the utilization of heat rays, although it is stated that such heat rays may come from an electric light. It is shown that this machine may be used "for study of the density of electron diffraction rings, which are made by electrical means, electron impact on a photographic plate. The plate is affected the same as it would be by light, but it is not light—and density distribution on the plate; and you study it by the use of this device."

The court held that this instrument was not an optical measuring or optical testing instrument and was properly classifiable as a scientific instrument since it was used in pure science. That case is not on all fours with the one we have now, inasmuch as in that case, though not in this, the device utilized heat rays, which, however, emanated from a light source and passed through a spectrum. It appears to be the closest reported parallel we have and to establish that the principle of the *Bliss* case lives on in the interpretation both of "optical measuring or optical testing instruments" (paragraph 228(a)) and of "all optical instruments" (paragraph 228(b)).

The record presented establishes that the Polarmatic is used for pure research in connection with scientific problems and not for any industrial or practical use. It is properly dutiable as a scientific instrument under paragraph 360, *supra.*

The protest is sustained and judgment will be rendered for the plaintiff.