(C.D. 2735)

CHAS. KURZ CO. *v.* UNITED STATES

United States Customs Court, First Division

(Decided July 20, 1966)

*Allerton deC Tompkins* for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Charles P. Deem* and *Harvey A. Isaacs*, trial attorneys), for the defendant.

Before OLIVER, NICHOLS, and WATSON, Judges

NICHOLS, Judge: The merchandise involved in this case is described on the invoice as "Niveaux d'atelier en coffret metal" (shop levels in metal box). It was imported from France and entered at the port of Philadelphia on July 13, 1960.[1] It was assessed with duty at 50 per centum ad valorem under paragraph 228(a) of the Tariff Act of 1930, as modified by the Torquay Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, T.D. 52739 and T.D. 52820, as optical measuring or optical testing instruments, frames and mountings, and parts, finished or unfinished. It is claimed that the merchandise is properly dutiable at 19 per centum ad valorem under paragraph 397 of said tariff act, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108, as articles of certain metals not specially provided for. A claim under paragraph 372 for classification as machine tools or parts thereof was not mentioned in plaintiff's brief and is deemed abandoned.

The pertinent provisions of the tariff act, as modified, are as follows:
Paragraph 228(a), as modified by T.D. 52739 and T.D. 52820:

Spectographs, * * * optical measuring or optical testing instruments, * * * frames and mountings therefor, and parts of any of the foregoing; all the foregoing, finished or unfinished_____ 50% ad val.

Paragraph 397, as modified by T.D. 54108:

Articles or wares not specially provided for, whether partly or wholly manufactured:

   *    *    *    *    *    *    *

---

[1] This case was heard and submitted before Judge Donlon at Philadelphia on April 8, 1964, and was reopened and resubmitted on December 8, 1964. Plaintiff's brief was filed on April 21, 1965; and defendant's brief on October 1, 1965. This case was resubmitted before the first division as presently constituted on May 17, 1966.

Composed wholly or in chief value of iron, steel, copper, brass, nickel, pewter, zinc, aluminum, or other base metal (except lead), but not plated with platinum, gold, or silver, or colored with gold lacquer:

\*       \*       \*       \*       \*       \*       \*

Not wholly or in chief value of tin or tin plate:

\*       \*       \*       \*       \*       \*       \*

Other, composed wholly or in chief
value of iron, steel, brass, bronze,
zinc, or aluminum (except \* \* \*)___ 19% ad val.

The sole witness at the trial was Frank T. Griswold, who was president and general manager of F.T. Griswold Manufacturing Co. in 1960. He testified as follows: The business of the company was the manufacture, importation, and sale of machines and parts for machine tools. He was personally familiar with the item on the invoice under protest described as "Niveaux d'atelier en coffret metal" and he purchased it. He had seen such items used in machine tool manufacturing shops, and had used them himself, and has assembled and repaired them. He had sold them to construction companies which build hydrodams or complicated building structures and had seen them used at such dams and construction places. The article is a level, a device to show if something is in true parallel with the true axis of the earth. It is used on construction sites to determine the levelness or deviation from parallel of whatever construction was concerned. This is done by moving the level from one part of the structure to another and observing if they were identical as to parallelism. The observation is made by looking at the glass vial which contains a liquid and an air bubble. By the movement of the air bubble to the right or left one can determine whether the piece upon which the level is placed is either rising or falling. Such a level is used in machine shops to see that the foundation upon which a machine is to rest is absolutely level. It may also be attached to a machine tool, but it is not a part of a machine tool.

The witness stated that he knew what materials are contained in the levels and that they are steel, aluminum, bronze, and glass. He said he had knowledge of the approximate proportions because he had had to buy glass parts as replacements in cases of breakage. He said that 85 percent of the article is of metal construction and 15 percent glass.

Mr. Griswold testified that the optical property of magnification is not used in connection with these levels but they do contain two prisms. The prisms enable the operator to observe the opposing ends of the air bubble in one vial at the same time or together. They are an aid to the eye and double the accuracy of the reading. There are three

level vials and two prisms in the instrument; it has no electrical features. The witness identified a catalog or leaflet describing the level involved here, prepared by the advertising manager of his firm under his direction. It was received in evidence as defendant's exhibit A. The witness stated that, although the device is referred to as an optical level in the catalog, that was an advertising promotion term to glamorize it; that the French called it a shop level, and the word "optical" was added to make it sound "super-duper." He said that the only optical parts were the prisms.

Exhibit A calls the article the Huet Optical Level, "A versatile precision instrument for the rapid measurement of flatness, straightness and parallelism." It describes the optical system and the method of operation as follows:

THE OPTICAL SYSTEM

\* \* \* \* \* \* \*

Two prisms are so arranged that one-half only of each end of the air-bubble in the master phial can be observed. \* \* \* When these two half images of opposite ends of the bubble form a perfect semicircle a true horizontal position has been established. As deviation from the true horizontal increases, due either to rise or fall, the two half images separate, move in opposite directions and appear at twice the distance they would be if the air-bubble was observed in the normal manner. Thus double the usual accuracy of level reading is obtained and, in addition, a very exact reference is observed.

\* \* \* \* \* \* \*

METHOD OF OPERATION

· Reference is first made to the two usual type bubble-phials to determine whether the surface to be examined is approximately level. Then, by means of the micrometer thimble, the hinged top of the Optical Level is moved up or down until the bubble in the longitudinal phial is located exactly between its index marks. This gives a reading as precise as can be obtained with any usual type shop level. Now the master bubble-phial is examined and, by movement of the micrometer thimble, clockwise or counterclockwise as may be necessary, the two half-bubble images are brought together to form a perfect semicircle. The figures on the micrometer barrel and thimble then show how much the work piece deviates from the true horizontal to one ten-thousandth part of an inch per foot.

After submission, the case was reopened and a stipulation submitted, to the effect that the merchandise was not plated with platinum, gold, or silver, nor colored with gold lacquer.

Plaintiff claims that the merchandise is not an optical measuring or optical testing instrument and is dutiable under paragraph 397, *supra*, as an article in chief value of metal, not specially provided for. Defendant does not discuss the collector's classification of the merchan-

dise under paragraph 228(a), but contents itself with arguing that the plaintiff has not established that the article is wholly or in chief value of metal and that the protest must, therefore, be overruled.

Plaintiff, of course, cannot prevail unless it proves that the merchandise is in chief value of certain metals. There is evidence of this, though it is meager. Mr. Griswold testified:

Q. Do you know what materials are contained in the levels before the court?—A. Yes.

Q. What are they?—A. There is steel, aluminum, bronze, and glass.

Q. Do you know the approximate proportions of those materials?—A. Yes.

Q. How did you obtain knowledge about that?—A. Because in cases of breakage we had to buy the glass parts as separate units to replace them.

Q. How do the glass parts compare with the metallic parts?—A. I would say it's a difference of probably 85 percent metal construction, 15 percent glass.

Presumably, this difference is in value, though the witness did not say so specifically. The metals specified are among those enumerated in paragraph 397, as modified. If, as the witness implies, he can replace the glass portions for 15 percent of the cost of the whole, this affords sufficient basis for finding that glass is not the component material of chief value, so metal has to be. Counsel for the Government did not cross-examine him on this point. This testimony is comparable with that in *Chas. Kurz Co.* v. *United States*, protest 62/7926, etc., 57 Cust. Ct. 73, C.D. 2733 (decided concurrently herewith), held sufficient to sustain plaintiff's allegation that the merchandise was in chief value of metal. Less elusive ways of proving essential facts are more favored by courts, however.

In order to prevail, plaintiff must also establish that the device before the court is not an optical measuring or optical testing instrument. Plaintiff claims it is a spirit level, but not an optical level. Under the Tariff Act of 1913, spirit levels were held classifiable as mountings for surveying instruments rather than as blown glass articles. *Leitz Co.* v. *United States*, 11 Ct. Cust. Appls. 426, T.D. 39434. The court described the articles as blown glass tubes, closed at both ends and etched with a graduated scale, containing liquid and an air bubble. They were imported for use in the manufacture of surveyor's transits, of which they became essential parts. The court called them "nonoptical" accessories. The instant merchandise is obviously more than the spirit levels involved there.

Although previous tariff acts contained provisions for "optical instruments," the term "optical measuring instruments or optical testing

instruments" first appeared in the Tariff Act of 1930. In an early case under that act, *Pyrometer Instrument Co.* v. *United States*, 63 Treas. Dec. 172, T.D. 46128, this court stated (p. 177) :

It seems to us that an optical measuring or testing instrument is such an instrument as optometrists use in testing or measuring the vision of patients in order that they may be properly fitted with eyeglasses or spectacles. * * *

That case was reversed in *United States* v. *Pyrometer Instrument Co.*, 21 CCPA 376, T.D. 46910, and in a later case in this court, it was noted that the definition in the *Pyromter* case appeared to cover only one class of optical measuring or testing instruments. *R. Y. Ferner* v. *United States*, 65 Treas. Dec. 961, T.D. 47101, affirmed *sub nom.*, *Clara M. Ferner, Executrix of the Estate of Roy Y. Ferner* v. *United States*, 23 CCPA 62, T.D. 47735.

The articles involved in the *Ferner* case were called spectographic comparators or universal measuring machines and were used to measure spectographic plates, astronomical photographs, fingerprints, oscillograph filaments, and machine parts. They were designed to be and were used for the purpose of very accurate measurements and measurement comparisons such as could not be made by hand and with the naked eye. A microscope or microscopes were integral and essential features of the devices. The court noted (p. 65) :

* * * that the close and accurate measurements for which the devices are intended cannot efficiently and properly function except by the use of the microscopes, since the devices are used in making microscopic measurements upon a scale containing microscopic measuring lines.

The court discussed the legislative history of the provision for optical measuring instruments and concluded (p. 67) :

Regardless of the scope intended by the term "optical measuring * * * instruments" and without indicating a precise definition of that term, and without suggesting everything which Congress might have contemplated would be provided for thereby, we feel certain that one of the instruments it intended to include therein was an instrument by which measurements were made, such as those involved in the consideration of the instant appeal, wherein optical devices and optical principles are involved and essential in making such measurements. That a microscope is an optical instrument is not disputed, and that an optical function is performed by the use of optical instruments when the devices at bar are used cannot be seriously questioned. Therefore, in view of the legislative history and the context of the paragraph under consideration and related paragraphs, we are of the opinion that the term "optical measuring * * * instruments" in paragraph 228(a) was intended to embrace instruments of the character of the ones represented by the exhibits at bar.

Plaintiff relies on and quotes *National Freight Co.* v. *United States*, 67 Treas. Dec. 209, T.D. 47510, which, however, antedates (and was reversed, 23 CCPA 138, T.D. 47993, on authority of) the *Ferner* case.

In *United States* v. *The Pyrometer Instrument Co.*, 23 CCPA 242, T.D. 48085, it was held that pyrometers were optical measuring instruments on the ground that they could be operated, for the purpose of ascertaining temperature measurements, only through the use of an optical system, which aided the human eye.

The *Ferner* case was distinguished, but not overruled, in *United States* v. *American Machine & Metals, Inc.*, 29 CCPA 137, C.A.D. 183, relied upon by the plaintiff. That case involved so-called Vicker's Hardness Testing Machines used to determine the hardness of metals. They employed an indenter which was pressed into the metal at a predetermined load and a predetermined rate of loading. The impression left in the metal was then measured by means of a microscope permanently attached to the machine and through such measurement and the record of the predetermined load and rate of loading, the hardness of the metal was ascertained. The court held that they were not optical measuring instruments, stating (pp. 144, 146) :

It therefore appears that, while an optical measurement is essential in the practical use of the article, that is only one of the essential elements. The article not only creates the indentation to be measured, but, to render the optical measurement of any value, the factors of the amount of load and rate of loading must be considered and weighed, and the making of the indentation and the loading and rate of loading are accomplished without the use of any optical instrument. Without the indentation in the metal and the recording of the predetermined load and rate of loading, the miscroscope [sic] would be useless as a measuring instrument. In our opinion an article cannot be classified as an optical measuring or optical testing instrument unless the dominant or primary use of the article lies in the employment of its optical features. Therefore, since it cannot be said that the dominant or primary use of the article here involved lies in the employment of the microscope, we hold that such article is not an optical measuring or optical testing instrument classifiable under paragraph 228 (a).

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

As hereinbefore stated, if the articles here under consideration involved only measuring by means of a microscope, as in the *Ferner* case, *supra*, or testing by means of a microscope, we should conclude that the articles are optical measuring or optical testing instruments; but the measuring constitutes only one function of the involved articles, although an essential function, and the other important functions of the article do not involve any optical function.

In *American Askania Corporation* v. *United States*, 21 Cust. Ct. 26, C.D. 1121, it was held that a magnetic field balance which indicated the balance between gravity force and magnetic attraction and which used the force of gravity for its operation was not an optical measur-

ing instrument, even though a lens eyepiece was used to assist in reading the action of the machine. It was established that the portion which included the scale, eyepiece, and lenses was not an integral part of the instrument and that an accurate reading could be obtained without the use of the lenses.

*Henry Wild Surveying Instrument Supply Co. of America et al.* v. *United States*, 32 Cust. Ct. 91, C.D. 1586, involved a "T3 precision theodolite" whose operation was described by the court as follows (p. 92):

* * * To obtain a reading with the use of the instrument, the eye end of a telescopic tube is sighted on the target to be defined. The particular angle desired is fixed by turning the theodolite on an axis located in the center thereof and "flipping" a glass prism, either to the right for a horizontal reading, or to the left for a vertical reading. A path of light (daylight), led into the instrument, is reflected on a mirror, and by means of an optical train, which includes the prisms and micrometer drums under consideration, the light rays are reflected, enlarged, and deflected, and finally carried to a micrometer drum from which the reading is made, down to two-tenths of a second of an arc.

The court held it was a surveying instrument whose primary purpose was to determine angles and that the optical features merely assisted in readings by bringing into focus for the eye to see what had already been determined. It held that, since "the predominant or primary use" did not "lie in the employment of its optical features," (p. 93) the device was not an optical measuring instrument.

Plaintiff relies heavily on *United States* v. *Bliss & Co. et al.*, 6 Ct. Cust. Appls. 433, T.D. 35980, which, however, construes a provision of the 1913 act quite unlike the one at bar.

In the instant case, it appears that the purpose of the device is to measure or test flatness, straightness, and parallelism. Although the witness stated it was identical to a carpenter's level, it is apparent from exhibit A that it is actually different. "Lenses and prisms are the fundamental parts of optical instruments." Summary of Tariff Information, 1929, page 552. Designation of the device as an "optical level" in exhibit A does not seem inappropriate. Unfortunately, plaintiff did not explain by word or diagram exactly how light is conducted through the article to the operator's eye. The presumption of correctness of the collector's classification compels us to suppose he found that the routing of light beams through prisms was an integral, indispensible feature of the merchandise, without which it would not measure or test flatness, straightness, and parallelism. No credible evidence before the court is inconsistent with or refutes such a finding. Therefore, the classification under paragraph 228(a) as modified, *supra*, is not shown to be incorrect and must stand.

The protest is overruled and judgment will be rendered for the defendant.