(C.D. 4351)

Parsons Optical Laboratories
Harper, Robinson & Co. } v. United States

United States Customs Court, First Division

(Decided April 7, 1972)

*Glad & Tuttle* (*Hudson F. Edwards* and *George R. Tuttle* of counsel) for the plaintiffs.
*L. Patrick Gray, III*, Assistant Attorney General (*Gilbert Lee Sandler*, trial attorney), for the defendant.

Before Watson, Maletz, and Re, Judges

Maletz, Judge: This case involves articles invoiced as applanation tonometers, models T900 and 870, which were manufactured in Switzerland, exported from The Netherlands, and entered at the port of San Francisco in October 1967. The importations were classified as "Medical, dental, surgical and veterinary instruments and apparatus (including * * * ophthalmic instruments), and parts thereof: Optical instruments and appliances, and parts thereof: * * * Other," under item 709.05 of the Tariff Schedules of the United States, and assessed duty at the rate of 50 percent ad valorem.

Plaintiff's present two alternative claims for classification: (1) as "* * * other instruments and apparatus for measuring or checking viscosity, porosity, expansion, surface tension, or similar properties * * *" under item 711.88, and dutiable at the rate of 22 percent ad valorem; and (2) as "Medical, dental, surgical and veterinary instruments and apparatus (including * * * ophthalmic instruments)

\* \* \*: Other [than optical instruments]: \* \* \* Other" under item 709.27 of the Tariff Schedules of the United States, and dutiable at the rate of 36 percent ad valorem.

The pertinent statutory provisions are, as follows:

Tariff Schedules of the United States, Schedule 7, Part 2, Headnote 3:

3. The term "optical instruments", as used in this part, embraces only instruments which incorporate one or more optical elements, but does not include any instrument in which the incorporated optical element or elements are solely for viewing a scale or for some other subsidiary purpose.

Tariff Schedules of the United States, Schedule 7, Part 2, Subpart B:

Medical, dental, surgical and veterinary instruments and apparatus (including electromedical apparatus and ophthalmic instruments), and parts thereof:

Optical instruments and appliances, and parts thereof:

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

709.05    Other _____    50% ad val.

Other:

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

Other:

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

709.27    Other _____    36% ad val.

Tariff Schedules of the United States, Schedule 7, Part 2, Subpart D:

Polarimeters, refractometers, spectrometers, gas analysis apparatus and other instruments or apparatus for physical or chemical analysis; viscometers, porosimeters, expansion meters and other instruments and apparatus for measuring or checking viscosity, porosity, expansion, surface tension, or similar properties; photometers (except photographic light meters), calorimeters, and other instruments or apparatus for measuring or checking quantities of heat, light, or sound; microtomes; all the foregoing, and parts thereof:

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

711.88    Other _____    22% ad val.

The imported applanation tonometers are used by ophthalmologists to ascertain intraocular (internal) pressure of the eye which in turn

provides helpful information in diagnosing certain eye diseases, principally glaucoma. In use, the imported tonometer is mounted above the binocular microscope of a slit lamp. The patient is seated at the slit lamp with his head on a chin rest. The cornea of the patient's eye is superficially anesthetized; then fluorescein—a yellow dye—is instilled in the eye and a blue filter is inserted in the path of the light. The tonometer contains a plastic, double-image prism which is brought into contact with the cornea by advancing the slit lamp. The physician then observes the area of contact of the prism to the cornea through the microscope of the slit lamp in order to determine whether the contact of the cornea is in the central part of the prism; if it is not, the physician adjusts his equipment accordingly. Then by turning a control knob, the pressure of the double-image prism increases the tension on the eye until the surface of the cornea is flattened. The desired degree of flattening is indicated when the two images of the cornea appear in juxtaposition to each other on the prism in two half circles, at which point the diameter of the flattened surface is 3.06 mm. When this occurs, a direct reading of the intraocular pressure is taken from a scale at the instrument's base.

Plaintiffs' witness, who was director of research of plaintiff Parsons, testified that in his opinion the dominant feature of the applanation tonometer is the accurate application of the pressure by the mechanism in the tonometer; that the role of the prism is merely to provide a scale to establish the diameter measurement of 3.06 mm; and that the retail price of the tonometer is $370.00, while the retail price of the prism alone is $28.00. He conceded, however, that the doubling effect of the prism creates an image which is split into two halves so that they can be seen by the physician; and that in order to operate the tonometer, it is necessary to look through the prism.

Defendant's witness—a qualified ophthalmologist—testified that the applanation tonometer's prism created a double image for inspection by the physician. Observation of the double image makes possible the determination of the required force to flatten the cornea which, in turn, provides helpful information in diagnosing diseases of the eye. He further testified that intraocular pressure and surface tension are not related and have nothing to do with each other. In this connection, he pointed out that surface tension is a quality of fluids, and it relates to their viscosity and the attraction they hold for vessels in which they are contained or surfaces toward which they are exposed. Intraocular pressure, on the other hand, is the outward push of the coats of the eye by the fluids within the eye. Continuing, the witness testified that observation of the double image is the means by which the physician determines if the proper amount of area has

been flattened, thereby enabling the physician to determine the amount of pressure required for flattening by reading the scale at the base of the tonometer.

The applanation tonometer, the witness said, functions both to flatten the eye and to take a reading from a specific flattened area. No diagnosis is made by looking at the double image; rather, the diagnosis is made from the information acquired from the tonometer's scale after determining that the required amount of cornea has been flattened and from the clinical background of the rest of the eye examination. In the witness' opinion, the base, which applies the pressure, is the most important part of the applanation tonometer. Finally, the witness stated that it is not clinically possible to accurately measure intraocular pressure with the imported article if there is no doubling prism or slit lamp.

To sum up, the imported instruments generate information concerning intraocular pressure by means of a "doubling" prism used in conjunction with a binocular microscope. The prism creates a double image, i.e., two half circles, of a portion of the surface of the eyeball which the ophthalmologist brings into juxtaposition, while viewing the image through the microscope. Having brought the image into juxtaposition, the ophthalmologist then reads the results of his work off the scale at the instrument's base.

In this setting, the essential question is whether the imported articles are "optical instruments." The term "optical instrument," as used in the tariff provision involved here, was (as previously indicated) specifically defined by Congress in headnote 3, part 2, schedule 7 of the tariff schedules:

> The term "optical instruments", as used in this part, embraces only instruments which incorporate one or more optical elements, but does not include any instrument in which the incorporated optical element or elements are solely for viewing a scale or for some other subsidiary purpose.

The *Tariff Classification Study*, Schedule 7 (1960), p. 140, indicates with regard to this definition that:

> Headnote 3 includes a definition of the term "optical instruments". This definition was not in the draft published for public hearings. It is believed that this definition substantially conforms with existing customs practice.

The existing customs practice with regard to the tariff definition of an "optical instrument" under the Tariff Act of 1930 and its predecessor acts was summarized as follows in *Engis Equipment Company* v. *United States*, 62 Cust. Ct. 29, 32, C.D. 3670, 294 F. Supp. 964, 966–67 (1969):

We start by detailing what characteristics are necessary to qualify a device as an optical measuring instrument for tariff purposes. First, the device must function in such manner that employment of its optical features is dominant or primary, as compared to the role of its other components. *E.g., United States* v. *American Machine & Metals, Inc.*, 29 CCPA 137, 144, C.A.D. 183 (1941); *Chas. Kurz Co.* v. *United States*, 57 Cust. Ct. 90, 96–97, C.D. 2735 (1966). Second, the device's optical elements must be essential to its operation; that is, to be considered an optical measuring instrument, the device cannot be operated in its intended manner without the optical components. See *e.g., Clara M. Ferner* v. *United States*, 23 CCPA 62, 67, T.D. 47735 (1935); *Bacharach Industrial Instrument Co.* v. *United States*, 2 Cust. Ct. 306, 312, C.D. 149 (1939). Third, optical measuring instruments must, in performing their intended function of measurement, act upon, deal with, or route rays of light. This interaction between light and such optical elements as lenses, prisms and mirrors normally manifests itself in divergence, convergence, reflection, refraction, polarization, or merely conveyance of light rays. *E.g., The Bendix Corporation* v. *United States*, 57 Cust. Ct. 184, 197, C.D. 2759 (1966); *Chas. Kurz Co.* v. *United States, supra*, 57 Cust. Ct. at 97; *R. J. Saunders & Co., Inc.* v. *United States*, 28 Cust. Ct. 39, 42–43, C.D. 1386 (1952); *Chicago Apparatus Co.* v. *United States*, 62 Treas. Dec. 567, 570–71, T.D. 46009 (1932). Finally, the optical system of the instrument must aid human vision or create for inspection a picture or image of some object. See *e.g., Paillard, Inc.* v. *United States*, 57 Cust. Ct. 439, 447–48, C.D. 2833 (1966); *The Bendix Corporation* v. *United States, supra*, 57 Cust. Ct. at 197; *Decca Radar, Inc.* v. *United States*, 57 Cust. Ct. 165, 171, C.D. 2755 (1966).

In turn, these judicial criteria were based in large part from the courts' reliance upon the *Summary of Tariff Information* (1929), which stated at page 552:

* * * Optical instruments are primarily used to aid or supplement human vision; they also include apparatus which depends for its operation on the passage of light through prismatic or lenticular optical glass. Lenses and prisms are the fundamental parts of optical instruments.

Against this background, we must conclude that the above-mentioned criteria are fully satisfied by the applanation tonometers in issue. First, it is indisputable that the imported articles incorporate the requisite optical elements considering that each includes a "doubling" prism. Nor is there any doubt that the "doubling" prism serves the optical purpose of acting upon, dealing with, and routing rays of light; also it serves the purpose of aiding human vision and creating for inspection a picture or image of some object. For, as we have seen, the prism creates a double image of an area of a patient's cornea. The physician inspects the images while moving the prism further forward

to the point at which such images come into juxtaposition with each other.

Further, it is clear that the optical features are essential to the instrument's operation since the testimony establishes that the instrument can not be successfully used without the optical elements. The purpose of applanation tonometers is to provide precise information concerning intraocular pressure, i.e., the internal pressure exerted on the outer surface of the eyeball, and without the optical elements no precise information is obtainable.

Finally, it is apparent from the operation of the import that its dominant or primary *use* lies in the employment of its optical features.[1] Examination of the manner in which the articles are operated establishes that it is through the mechanism of the optical feature that the imported articles achieve their purpose of supplying information concerning intraocular pressure. The operation of the articles begins and ends with the optical element since after the physician has finished his observation of the double image, he merely reads the results of his work off the scale located at the base of the instrument. Thus, it is the optical element which performs the instrument's intended function of generating the information which is sought. Plaintiffs' witness succinctly described the operation of the applanation tonometers and in so doing necessarily indicated that the dominant use of the articles lies in the employment of its optical features (R. 13):

> The operator then observes the area of contact of the prism through the microscope of the slit lamp, so that he can determine whether the area of contact is in the central part of the prism and, if it is not, he adjusts his equipment accordingly so that the area of contact shows up in the center of the prism. The pressure on the prism, then, is increased by means of the control knob on the applanation tonometer *until two half circles, which are depicted in the literature, are brought into coincidence,* so that the operator then knows that a certain definite area of the cornea has been flattened and at that point, the tonometer is backed away from the cornea and the direct reading of pressure is taken from the scale. [Emphasis added.]

On this aspect, we note that the function of the prism in the imported tonometers is quite similar to the function of the optical elements in instruments known as "autocollimators" which were held to be optical surveying instruments in the *Engis Equipment* case, *supra.* This is

---

[1] The test in this connection is not whether the optical element is itself the most important part of the instrument but rather whether the dominant or primary use of the article lies in the employment of its optical features. See e.g., *United States* v. *American Machine & Metals, Inc.,* 29 CCPA 137, 144, C.A.D. 183 (1941) ; *Chas. Kurz Co.* v. *United States,* 57 Cust. Ct. 90, 96–97, C.D. 2735 (1966).

illustrated by the operation of the autocollimators which was described by the court as follows (62 Cust. Ct. at 31) :

> The instrument is built on a flat base with leveling screws so that it can be laid on a flat surface, level to a given plane and a mirror moved in front of it. An image of the graduated reticle, illuminated by the light source, leaves the collimator as parallel rays of light. These parallel rays are then reflected back into the collimator by means of the mirror, and the reticle image is thereby returned to and focused on the glass filar plate that is contained in the micrometer box. *If the returning image of the reticle and the actual reticle are congruent or superposable, this signifies that the surface is perfectly flat. On the other hand, failure of the reflected reticle image to coincide with the reticle drawn on the filar plate signifies that the surface is not perfectly flat.* Measurement then consists of a comparison between this deviation and the normal position. This is accomplished by an operator viewing these real and reflected images through the eyepiece of the microscopic unit and then taking a reading. [Emphasis added.]

Accordingly, the optical element involved here serves a primary or dominant operational purpose, much as did the optical elements in the articles involved in the *Engis Equipment* case.

To similar effect is *Chas. Kurz Co.* v. *United States, supra*, 57 Cust. Ct. 90, where the court was concerned with "optical levels" which were instruments used by construction companies to determine whether something was in true parallel with the axis of the earth. These optical levels contained two prisms arranged so that one-half of each end of the air bubble in the master vial could be observed; then when the two half-images of the opposite ends formed a perfect semicircle, a true horizontal position was established. These optical levels—whose operations bear considerable similarity to the operations of the present imports—were found by the court to be optical measuring devices.

Correlatively, it is to be observed that the optical elements involved here do not serve the subsidiary purpose of providing a means of reading the instrument's scale or read-out, as did the optical elements in the cases relied upon by plaintiffs to support their allegation that the imported tonometers are not optical instruments. For example, in *United States* v. *American Machine & Metals, Inc.*, 29 CCPA 137, C.A.D. 183 (1941), the court held that a microscope incorporated into a metal hardness testing machine was not primary or dominant because the primary feature of the machine was a separate non-optical apparatus which first indented the metal to be tested. It was only thereafter that the microscope was employed to measure the previously, and independently, made indentation. Accordingly, the court stated (p. 143) :

> So, while the articles here involved each contains a microscope which is used to measure an indentation made by the articles, such

measurement is not the dominant or primary function for which the article is designed. The microscope is used to measure an indentation upon the metal made *by the article itself*, at a predetermined load. [Emphasis in original.]

Similarly, in *Henry Wild Surveying Instrument Supply Co. of America, et al.* v. *United States*, 32 Cust. Ct. 91, C.D. 1586 (1954), the court held that glass prisms and glass micrometer drums were not the dominant or primary feature of T3 theodolites (used by surveyors in triangulation) because the optical feature therein was employed "only as an aid for reading results accomplished by the instrument." *Id.* at 93.

By contrast, the optical elements involved here are the features through which the instruments accomplish their purpose of precisely flattening the cornea, and thereby generating the information which the physician will then gather from the scale at the instrument's base. This flattening is accomplished by the physician's bringing into juxtaposition the double image created by the prism, as seen by the physician looking through the binocular microscope and the "doubling prism." Thus, the optical elements in issue here are not used to read the results of the instruments but are the features through which the instruments achieve results.

We therefore hold that the imported tonometers were properly classified as *optical* ophthalmic instruments. Accordingly, we overrule plaintiffs' claims for classification of the imports as *non-optical* ophthalmic instruments (item 709.27) or as *non-optical* instruments for measuring or checking surface tension or similar properties (item 711.88). Judgment will be entered accordingly.